Mildred Mitchell JONES et vir, Appellants,

v.

S. H. KILLINGSWORTH et al., Appellees.

No. 2.

Court of Civil Appeals of Texas.

Tyler.

May 7, 1964.

Rehearing Denied June 4, 1964.

John A. Pace, Edward Kliewer, Jr., Dallas, for appellants.

Ralph B. Shank, Shank, Irwin & Chester, Dallas, Frank L. McClendon, Ramey, Brelsford, Hull & Flock, Tyler, Prentice Wilson, Dallas, F. Wilbert, Lasater, Spruiell, Lowry, Potter, Lasater & Guinn, Murph Wilson, Wilson, Miller, Spivey & Steger, Tyler, for appellees.

MOORE, Justice.

This suit was instituted by Mildred Mitchell Jones, plaintiff, joined pro forma by her husband, against S. H. Killingsworth and other defendants, seking a judgment declaring that a certain mineral lease heretofore executed by her, to have terminated at the expiration of its primary term because lessee exceeded his authority in pooling her land in a unit substantially larger than the 40-acre tract provided in the lease; she is also seeking to remove the cloud upon her title by reason of such lease, and for title and possession of the leased premises. In a trial before the court, without a jury, judgment was rendered for the defendants, thereby holding that the lease did not terminate at the expiration of its primary term, to which judgment appellants (plaintiffs) excepted and perfected this appeal.

All material facts of the case were either stipulated or agreed to by the parties or sought to be proved by exhibits. It was stipulated that the lease was duly executed by Mildred Mitchell, then a feme sole, on August 16, 1951, to S. S. Long, defendant Killingsworth predecessor in title, for a primary term of ten (10) years; that the lease was in full force and effect on July 12, 1961, on which date defendant Killingsworth, then the owner of the Mitchell-Long lease, entered into a pooling agreement wherein he pooled the land covered by the lease, along with other leases to form the Hunt Oil Company, et al—West Poynor Unit for the production of oil; that based upon the recitations in the leases as to acreage, the defendants believed the area in the pooled unit to contain 150.47 acres; that on July 3, 1961, before commencing drilling operations, defendants made application to drill the well upon the unit, which application supplied all the information required by the Railroad Commission, as well as a plat delineating the boundaries of the proposed 150.47-acre Hunt Oil Company—West Poynor Unit. Based upon the application, the Commission granted a permit to drill the well on July 6, 1961; that the well was drilled within the unit, but not on plaintiffs' land, and was completed as a producing oil well before the expiration of the primary term of the lease on August 16, 1961, which well has, since said date, continued to produce oil in paying quantities; that during September and October, 1961, the unit operator, Hunt Oil Company, made an actual survey of the unit on the ground and after completion of the survey discovered that the unit actually contained 170.86 acres, rather than 150.47, as recited in the leases; that on November 14, 1961, defendants amended the description of the unit so as to exclude 10.86 acres therefrom, thus leaving 160 acres in the unit; however, none of the appellants' land was excluded, but was left in the unit as originally pooled. It was stipulated that appellee acted in good faith in pooling the land of appellants under the lease; that appellee was in good faith in making the application to the Railroad Commission for a permit to drill the unit well and at all times acted in good faith in drilling, completing, equipping and producing the unit well.

The controversy involves the question of whether or not paragraph 4 of the lease grants lessee the authority to pool appellants' land into an oil unit consisting of more than 40 acres.

Paragraph 4 of the lease reads as follows:

"4. Lessee, at its option, is hereby given the right and power to pool or combine the acreage covered by this lease, or any portion thereof as to oil and gas, or either of them, with other land, lease or leases in the immediate vicinity thereof to the extent, hereinafter stipulated, when in Lessee's judgment it is necessary or advisable to do so in order properly to develop and operate said leased premises *in compliance with the spacing rules of the Railroad Commission of Texas*, or other lawful authority, or when to do so would, in the judgment of Lessee, promote the conservation of oil and gas from said premises. Units pooled for oil hereunder shall not substantially exceed 40 acres each in area, and units pooled for gas hereunder shall not substantially exceed in area 640 acres each plus a tolerance of 10% thereof, provided that should governmental authority having jurisdiction *prescribe* or *permit* the creation of units larger than those specified, units thereafter created may conform substantially in size with those *prescribed* by governmental regulations." (Emphasis supplied.)

The habendum clause in the lease is to be found in paragraph 2 and reads as follows:
"Subject to the other provisions herein contained, this lease shall be for a term of ten (10) years from this date * * * and as long thereafter as oil * * * is produced from * * * land with which said land is pooled hereunder."

The pertinent Rules and Regulations of the Railroad Commission for the Fairway Field at the time the Unit Declaration effecting the pooling was executed and filed provided under Rule 1 that no oil or gas well could be drilled upon a tract or unit containing less than 40 acres, and further provided:

"The aforementioned distances in the above rule are minimum distances to allow an operator flexibility in locating a well, and the *above spacing rule* and the other rules to follow are for the purpose of permitting only one well to each eighty (80) acre proration unit." (Emphasis supplied.)

Rule 2 provides in part as follows:

"The acreage assigned to the individual oil well for the purpose of allocating allowable oil production thereto shall be known as a proration unit. No proration unit shall consist of more than eighty (80) acres except as hereinafter provided, and the two farthermost points in any proration unit shall not be in excess of forty two hundred (4200) feet removed from each other * * *.

"Provided, however, that operators may elect to assign tolerance of not more than eighty (80) acres of additional unassigned lease acreage to a well on an eighty (80) acre unit and shall in such event receive allowable credit for not more than one hundred sixty (160) acres."

Appellees, in connection with their Unit Designation and application for a permit to drill upon the 150.47-acre unit, made the following declaration:

"WHEREAS, the undersigned owners, in order to promote conservation and to comply with the spacing rule adopted by the aforesaid Order, desire to designate a unit for the purpose of drilling for and producing oil from the James Lime formation underlying the unit area hereinafter described."

The permit issued by the Railroad Commission of Texas dated July 6, 1961, granting appellee a permit to drill upon the Designated Unit, contained the following language.

"Based upon the representations made on the above Form 1 and those

made on *any plat or plats* filed therewith, it is believed that the operation indicated, when carried out at that point which you have represented to be the location of the above designated Well, *complies* as of the date hereof, *with the provisions of the applicable Commission spacing rule*, subject to the limitations, if any, set out below. * * *" (Emphasis supplied.)

Appellants now contend that even though the Railroad Commission granted the permit to drill for oil upon the Designated Unit which contained 150.47 acres, such unit of such size was not "prescribed" by any of the regulations issued by the Commission and since the lessee was only authorized to form a unit that would conform substantially in size to those "prescribed" by the Commission, lessee, in pooling her lands in a unit substantially larger in size than that "prescribed" by the Commission, exceeded his authority and therefore, her land never having been effectively pooled, the lease expired at the end of its primary term.

Appellants contend that the second sentence in paragraph 4 of the lease, in providing that "Units pooled for oil hereunder shall not substantially exceed 40 acres each in area * * *" is clearly referring back to the power to pool granted in the first sentence of paragraph 4, i. e., in order to comply "with the spacing rules of the Railroad Commission of Texas" and the proviso of such second sentence reading as follows:

" * * * provided that should governmental authority having jurisdiction prescribe or permit the creation of units larger than those specified, units thereafter created may conform substantially in size with those prescribed by governmental regulations" (Emphasis supplied)

can properly only be construed to authorize pooling of appellants' land into oil units of an area "substantially exceeding 40 acres" when, to comply with the spacing rules of the Railroad Commission, the well is required to be located on a larger tract. And since the latter part of this clause omits the word "permit," which appears earlier in the proviso, lessee gained no authority to do that which was "permitted" as distinguished from that "prescribed".

In this connection, appellant cites the following definition of the terms: "Permit" is defined by Webster as follows:

"Permit (L. permittere, permissum, to let through, to allow, permit, fr. per—mittere to let go, send. See per—; mission.) 1. To allow the act or existence of; to tolerate; to consent to expressly or formally; to grant leave for or the privilege of; as, to permit smoking. 2. To grant (one) license or liberty; to authorize; to give leave; —usually followed by an infinitive; as, to permit him to answer; to permit oneself to become extravagant. Syn.—Let, grant, suffer. See Allow. Ant.—Forbid, prohibit."

whereas "prescribe" is defined:

"Prescribe (L. praescribere, praescriptum, fr. prae before—scribere to write, see scribere.) 2. To lay down authoritatively as a guide, direction or rule of action; to impose as a premptory order; to dictate; direct; ordain; as, to prescribe regular hours of study. 3. To keep within limits or bounds; to restrain; to confine. Syn.—Limit, control, order, guide."

Hence, appellant argues that under paragraph 4 of the lease the lessor granted lessee the power to pool lessor's land into oil units substantially exceeding 40 acres in size only if "the spacing rules of the Railroad Commission of Texas," require or order (i. e., prescribe) that an oil well be located on a tract substantially larger than 40 acres.

Appellant further contends that the lease did not grant authority to pool the leased land into proration units, but only grants authority to pool the leased land into units

of the size prescribed by the Spacing Rule, i. e., 40 acres, and not having pooled the appellants' land in compliance with the provisions thereof, the lease terminated at the expiration of its primary term.

Appellee, on the other hand, contends that the authority conferred by the lease is a broad "sweeping" power, not confined only to units involving spacing provisions but to proration and conservation as well, and that under the terms thereof, he was authorized to form a 160 acre unit, and that the production of oil from any part thereof would prevent termination of appellants' lease at the end of the primary term.

Appellant presents two points on this appeal wherein it is contended that (1) the trial court erred in holding the lease and the land covered thereby was effectively pooled in accordance with the terms and conditions of the pooling provisions in the lease, and (2) that the trial court erred in holding that the lease is now a valid and subsisting lease.

■ The outcome of this controversy will depend upon the meaning to be accorded to the language used in paragraph 4 of the lease under consideration. Although the parties seem to agree that there is no ambiguity in the provisions of the lease, their interpretation of the language used therein brings them to exactly opposite conclusions. The fact that the parties have reached opposite conclusions does not in and of itself render the contract ambiguous, and we have concluded that there is no ambiguity. Phillips Petroleum Co. v. Harnly, Tex.Civ.App., 348 S.W.2d 856. The meaning of that section of the contract in dispute must therefore be determined as a matter of law by the language used therein. Lewis v. East Texas Finance Co., 136 Tex. 149, 146 S.W.2d 977; Tower Contracting Co. v. Flores, 157 Tex. 297, 302 S.W.2d 396.

■ Although no presumption exists in favor of the trial court's determination of the meaning of the language used in the lease, if there be any question in regard to the sufficiency of the evidence, this court is bound by the well-settled rule that when the appellants contest the trial court's judgment without requesting findings of fact and conclusions of law, as is the case here, the judgment must be sustained if there is any evidence of probative force to support it on any theory of the case. Highsmith v. Tyler State Bank & Trust Co., Tex.Civ.App., 194 S.W.2d 142; City of Abilene v. Meek, Tex.Civ.App., 311 S.W.2d 654.

■ In the interpretation of oil and gas leases as in other forms of contracts, it becomes our duty, as best we can, to ascertain the meaning of the contract as an expression of the intention of the parties, each provision of the contract must be accorded its reasonable, natural and probable meaning, when considered in relation to the whole. We cannot seek to find some technical basis for finding an ambiguity when a reasonable interpretation will permit all to prevail. The strict or narrow construction is always subordinate to the rule of reasonable construction. Bouldin v. Gulf Production Co., Tex.Civ.App., 5 S.W.2d 1019; Southwestern Life Ins. Co. v. Houston, Tex.Civ.App., 121 S.W.2d 619.

The problem of determining the authority granted by the lessor to lessee in the pooling provisions of oil and gas leases is not new in the jurisprudence of this state. In the case of Tiller v. Fields, Tex.Civ.App., 301 S.W. 2d 185, where the authority of the lessee was in question, the court made the following observation:

"Anticipatory provisions in leases for the commitment by the lessee of such leases to unitization, of necessity must be in general terms. Neither the lessor nor the lessee has any way of knowing at the time the lease is taken the facts with respect to which it will be necessary for the lessee to apply his power. It is not practicable for the lessee to await the ascertainment of such facts. He knows from experience that because

of the possibility of many changes in ownership of the lessor's interest as time goes on, it may be difficult to effect an agreement if the right to unitize is not included in the lease itself. Phillips Petroleum Co. v. Peterson, 10 Cir., 218 F.2d 926. The Texas courts, as well as other courts, have recognized these basic facts, and have consistently sustained the basic validity of lease pooling provisions and units formed under their authority. * * *"

Again in Texaco, Inc. v. Lettermann, Tex.Civ.App., 343 S.W.2d 726, the extent of the authority of the lessee under the pooling provision was questioned and the court held:

"That pooling or unitizing of oil and gas leases is a standard practice in the industry cannot be questioned. It is equally recognized that unitization is often a more feasible method of operation from an engineering and scientific point of view. Unitization can be said to be advantageous to both lessors and lessees. We think these facts lead to the conclusion that in the absence of clear language to the contrary, pooling clauses should not be construed in a narrow or limited sense. The United States Court of Appeals, 10th Circuit, in Phillips Petroleum Co. v. Peterson, 218 F.2d 926, 933 was considering a unitization provision in a mineral lease. In such a situation the court held the relationship between the lessor and lessee was analogous to that between principal and agent and cited Imes v. Globe Oil & Refining Co., 184 Okl. 79, 84 P.2d 1106. The court further held that the pooling clause 'is in the nature of a power coupled with an interest, and is, therefore, irrevocable.' Such language, together with the conclusions reached by the courts, indicates the power to pool leases by the lessee should be given broad powers * * *."

The relationship between lessor and lessee being, in some respect, analogous to that of a principal and agent, such broad powers granted in the pooling provisions of the lease would, of course, likewise be limited by the duty owed by the lessee to exercise a high degree of good faith and loyalty in the furtherance of the interest of the lessor.

We have concluded that the above and foregoing rules and broad principles announced by the courts of this state find application to the legal effect of the pooling provisions in the lease in the case before us.

■ Turning now to the provisions of paragraph 4 of the lease, and keeping in mind the principles announced in the above cases, it is obvious that in this case the lessor intended to grant the lessee the power and authority to pool her land with other lands. She obviously intended to grant her lessee the power and authority to include her lease within a pooled unit. Being thus authorized to pool and to place the lease in a pooled unit, the question then becomes a question of the extent of the lessee's authority in formulating the type and size of the unit. Lessee's authority to pool to comply with spacing rules of the Railroad Commission of Texas and his authority to pool when in his judgment such pooling would promote conservation is not in question. According to the agreement of the parties in paragraph 4 of the lease, units pooled for oil could not substantially exceed 40 acres, but recognizing that governmental authority might "prescribe" certain governmental regulations, lessor agreed that in such event lessee's authority would then be extended so that he would be authorized to form a unit which would conform substantially in size to that "prescribed" by governmental regulations. In determining the extent of lessee's authority under this provision, we must determine what lessor meant by the use of the word "units" and what lessor meant by the term "governmental regulations". In other words, does the lease by the use of the term "units" limit the lessee's authority to only "units" formed for the purpose of spacing or does such term have reference

generally to both spacing and proration units. Since the lessor granted lessee the authority to pool when in his judgment it was necessary for spacing purposes as well as for conservation purposes, we conclude that the term "units" as used in the lease was intended to give the lessee broad authority to form a "unit" for either purpose. The same question also arises with regard to the meaning of the word "governmental regulations". In other words, does the term only have reference to spacing regulations or is it a general term referring to both spacing and proration. Not being specific, we must conclude that it generally includes both spacing and proration. Therefore, the conclusion is reached that the lessee was given authority to form units for proration purposes, as well as for spacing purposes. But even so, such authority in sizing is limited to that "prescribed" by governmental regulations. As was pointed out above, the term "prescribe" means, "To lay down authoritatively as a guide, direction or rule of action."

Turning now to the "prescribed" governmental regulations, we find that the applicable rules and regulations for the Fairway Field, in which appellants' land is located, as promulgated by order of the Railroad Commission of Texas, laid down authoritatively as a guide, direction or rule of action (1) that the spacing rule for each well was to be a minimum of 40 acres (which is but a re-statement of the state-wide spacing rule) ; (2) that only one well would be permitted to each eighty (80) acre proration unit; and (3) that no proration unit should consist of more than 80 acres, provided, however, operators might elect to assign tolerance of not more than eighty (80) acres of additional unassigned lease acreage to a well on an eighty (80) acre unit, in which event the operator would receive allowable credit for not more than one hundred sixty (160) acres.

Lessee was bound and obligated to keep within those rules laid down by govern-

mental authority as a guide, direction or rule of action, otherwise, he would exceed his authority. But, so long as he kept within the "prescribed" rules, he was authorized to form any type of unit "prescribed" or authoritatively laid down as a guide, direction or rule of action by governmental authority.

■ The regulation grants authority to assign an additional eighty (80) acres of unassigned leases to an 80-acre proration unit for a production unit of 160 acres. In combining appellant's lease in accordance with this regulation, appellee was acting within the scope of the authority granted by the appellant in authorizing him to do that which was "prescribed" by governmental regulations. Although the unit as originally formed was later determined by a survey on the ground to contain 170.86 acres rather than 150.47 acres as shown by the leases, we believe that it conformed substantially in size to the 160-acre units prescribed by governmental regulations. The act of the lessee in reducing the size of the unit from 170.86 to 160 acres by eliminating the excessive 10.86 acres, in order to make the unit more nearly "conform substantially" in size to that prescribed by governmental regulations, was in the best interest of the lessee and we think was within the scope of authority granted in the lease.

■ It being undisputed that appellee—Lessee acted in good faith in pooling the leased premises and acted in good faith in forming the unit, applying for the permit, drilling and producing oil upon the unit prior to the expiration of the primary term of the lease, and we having concluded that lessee did not exceed his authority granted him in the lease in the creation of the unit, it follows that the lease did not terminate at the expiration of its primary term, but remained in full force and effect.

The judgment of the trial court is affirmed.