Mildred Mitchell JONES et vir, Petitioners,

v.

S. H. KILLINGSWORTH et al., Respondents.

No. A–10243.

Supreme Court of Texas.

Dec. 8, 1965.

Rehearing Denied and Dissenting Opinion
Filed April 20, 1966.

John A. Pace, Edward Kliewer, Jr., Dallas, for petitioners.

Ralph Shank, Prentice Wilson, Dallas, Murph Wilson, F. Wilbert Lasater, Ramey, Brelsford, Hull & Flock, Frank L. Mc-Clendon, with above firm, Tyler, for respondents.

SMITH, Justice.

## ON MOTION FOR REHEARING

Our opinion delivered on June 23, 1965, is withdrawn and the following opinion is substituted therefor.

The question presented for our determination is whether or not the lands owned by the petitioner, Mildred Mitchell Jones, and described in an oil, gas and mineral lease executed by Mildred Mitchell Jones and her husband, Harry C. Jones, as lessors, to S. S. Long, as lessee (later assigned to S. H. Killingsworth), on August 16, 1951, were effectively pooled into what is known as the Hunt Oil Company et al.—West Poynor Unit. The trial court, without a jury, held that Killingsworth effectively pooled the acreage covered by the lease in accordance with authority granted in the lease, and for that reason the lease did not terminate on August 16, 1961, the date of the expiration of the primary term. A take-nothing judgment rendered against the petitioners has been affirmed by the Court of Civil Appeals. 379 S.W.2d 362.

The judgments of both the trial court and the Court of Civil Appeals are reversed and judgment is rendered for the petitioners.

Mildred Mitchell Jones and her husband filed this suit against S. H. Killingsworth and owners of leases in the immediate vicinity of the Mitchell-Long lease. These owners will be referred to as "Hunt Petroleum Corporation." On July 12, 1961, at a time when the Mitchell-Long lease was in effect and was owned by and the title thereto was vested in S. H. Killingsworth, subject to certain overriding royalty interests, Kill-ingsworth, joined by the above-mentioned owners of other leases, entered into a pooling agreement establishing a unit hereinafter referred to as the "West Poynor Unit." The two tracts of land described in the Mitchell-Long lease were included within this unit designation. These tracts contained, in the aggregate, 20.55 acres. It was stipulated that the created unit contained 170.86 acres. However, the parties deal with this unit as though it contains only 160 acres.

It was stipulated that the unit owners commenced drilling operations on the West Poynor Unit and completed a producing oil well on or about August 16, 1961, which "unit well" has continued to produce oil in paying quantities. It was agreed that "no well in search of oil, gas or other minerals has been drilled by S. H. Killingsworth and the other defendants on the lands actually described by metes and bounds in the Long lease, and that no oil, gas or other minerals in paying quantities has been produced from any well actually located on the lands actually described in the Long lease."

Although lessors contend that they are not bound by the terms of the Unit Declaration and the Amended Unit Declaration, it is agreed that Killingsworth and the other unit owners in the unit acted in good faith in forming the unit, in securing a permit to drill and in drilling the well on the unit.

The habendum clause of the Mitchell-Long lease provides that:

"Subject to the other provisions herein contained, this lease shall be for a term of ten (10) years from this date * * * *and as long thereafter as oil* * * * is produced from * * * land with which said land is pooled hereunder."

The pertinent pooling provisions of the lease are to be found in the first two sentences of paragraph 4 of the Mitchell-Long lease. These sentences read as follows:

"Lessee, at its option, is hereby given the right and power to pool or

combine the acreage covered by this lease, or any portion thereof as to oil and gas, or either of them, with other land, lease or leases in the immediate vicinity thereof to the extent, hereinafter stipulated, when in Lessee's judgment it is necessary or advisable to do so in order properly to develop and operate said leased premises in compliance with the spacing rules of the Railroad Commission of Texas, or other lawful authority, or when to do so would, in the judgment of Lessee, promote the conservation of oil and gas from said premises. Units pooled for oil hereunder shall not substantially exceed 40 acres each in area, and units pooled for gas hereunder shall not substantially exceed in area 640 acres each plus a tolerance of 10% thereof, provided that should governmental authority having jurisdiction prescribe or permit the creation of units larger than those specified, units thereafter created may conform substantially in size with those prescribed by governmental regulations."

■ The issue in this case is not whether the pooling clause granted authority to pool the Jones' land into an oil unit consisting of more than 40 acres. The issue, properly defined, is whether the pooling clause granted authority to pool the Jones' land into an oil unit containing 170.-86 acres. The lessors take the position that authority to pool their land into an oil unit consisting of 170.86 acres was not granted by the lease, and that the attempt to pool did not effectively extend the term of the lease beyond the terminal date provided therein. We agree with the lessee that the pooling provision confers authority on the lessee to pool the lessors' land, but, we do not agree that the *extent* to which the power to pool may be exercised is entrusted solely to the lessee's judgment. The lessors' land may be pooled only to the extent stipulated in the lease. The second sentence of the pooling provision provides that "units pooled for oil * * * shall not substantially exceed 40 acres each in area, and units pooled for gas * * * shall not substantially exceed in area 640 acres each plus a tolerance of 10% thereof. * * *" However, this provision must be construed in the light of the further provisions which is to the effect that in the event a governmental authority having jurisdiction should "*prescribe or permit* the creation of units larger than those specified units thereafter created may conform substantially in size with those *prescribed* by governmental regulations." [Emphasis added.] Absent this proviso, perhaps it could well be said that the lessee was given authority to pool the lessor's land for oil only in units not substantially exceeding 40 acres in area for either the purpose of complying with spacing rules or to promote the conservation of oil, the two situations mentioned in the first sentence wherein the power to pool is left exclusively to lessee's judgment. In order to ascertain the true intention of the parties to this lease, the Court should take into consideration all of the pooling provisions contained therein, as well as the rules and regulations governing the Fairway (James Lime) Field in which lessors' land is located. [The rules adopted by the Railroad Commission governing that field have the express purpose of "permitting only one well to each eighty (80) acre proration unit." The field rules only encourage larger units by *permitting* an operator "to assign tolerance of not more than eighty (80) acres of additional unassigned lease acreage to a well on an eighty (80) acre unit and shall in such event receive allowable credit for not more than one hundred sixty (160) acres."] It is argued that these Railroad Commission rules provide for proration units of not less than 80 acres more than 160 acres, and that by reading the rules into the lease contract, paragraph 4 of the lease would read: "the size of the units thereafter created may not be substantially less than 80 acres nor substantially more than 160 acres." We disagree with this construction of the lease

contract. The lessors did not consent to enlarge an oil proration unit to any size *permitted* by governmental regulations. They gave their consent to enlarge a unit of substantially 40 acres, but only to the extent of the size of units *prescribed* by the regulatory authority. The fact that the Railroad Commission may *permit* a much larger unit cannot be read into the lease contract when, as here, the authority to create larger oil units is expressly limited to units of the size *prescribed* by the Railroad Commission. The Commission *prescribed* a unit of 80 acres. [The field rules clearly say that there *must* be a proration unit of at least 80 acres, and there *may* be larger units of not more than 160 acres.] It is true that the pooling provision contains the word "permit" as well as the word "prescribe." It is not unreasonable to assume that the parties to the lease contract intended, by the use of both words, to give each a distinctly different meaning. The parties obviously knew when the lease contract was executed that a *permitted* oil proration unit could conceivably be much larger in area than one *prescribed* by governmental authority. To say that a lessee can pool lessors' land with units of any size *permitted* by the Railroad Commission would defeat the intention of the parties to restrict the size of the units to the size *prescribed* by governmental authority. Absent express authority, a lessee has no power to pool interests in the estate retained by the lessor with those of other lessors. See Brown v. Smith, 141 Tex. 425, 174 S.W.2d 43 (1943); Gulf Oil Corporation v. Marathon Oil Co., 137 Tex. 59, 152 S.W.2d 711 (1941); Knight v. Chicago Corporation, 144 Tex. 98, 188 S.W.2d 564 (1945). Since the lands were pooled without authority, the habendum clause in the Mitchell-Long lease cannot be used to extend the term of the lease beyond August 16, 1961, the terminal date of the primary term of the lease.

■ Killingsworth and the Hunt Petroleum Corporation contend that the pooling clause in the Mitchell-Long lease created a relationship of principal and agent, or at least created a relationship similar to that of principal and agent, and that performance by the lessee is to be measured by the standard of good faith. It is true that the lessee acted in good faith. It is true that the lessee was given authority to pool. It is equally true that the permit granted by the Railroad Commission is unquestionably valid. Even so, the acts of the Railroad Commission cannot be said to operate effectively to extend the restrictive terms of the lease. The orders of the Railroad Commission cannot compel pooling agreements that the parties themselves do not agree upon. The Railroad Commission has no power to determine property rights. See Ryan Consolidated Petroleum Corp. v. Pickens, 155 Tex. 221, 285 S.W.2d 201 (1955); Magnolia Petroleum Co. v. Railroad Commission, 141 Tex. 96, 170 S.W.2d 189 (1943); Nale v. Carroll, 155 Tex. 555, 289 S.W.2d 743 (1956).

[The judgments of the trial court and the Court of Civil Appeals are both reversed and judgment is rendered declaring the Mitchell-Long lease terminated as of August 16, 1961, and the title and possession of the lands described in said lease is awarded to Mildred Mitchell Jones. Respondents' motion for rehearing is overruled. A second motion for rehearing may be filed within fifteen days.]

GRIFFIN, HAMILTON and POPE, JJ., dissenting.

HAMILTON, Justice (dissenting).

I withdraw the dissenting opinion heretofore filed in this cause on June 23, 1965, and file the following opinion, respectfully dissenting:

I disagree with the Court's construction of the pooling agreement in the oil and gas lease under consideration and with the application of the pooling agreement to the rules and regulations adopted by the Railroad Commission. Construing the pool-

ing agreement in its entirety simply means that the lessee was given authority to pool the lessor's land with other land in units, the size of which are controlled by the rules and regulations of the Railroad Commission.

The applicable rules and regulations for the development of the Fairway (James Lime) Field, in which the pooling unit in question is located, are set out in Railroad Commission Order No. 6–45, 322. Rules 1 and 2 of that order are as follows:

"RULE 1: No well for oil or gas shall hereafter be drilled nearer than eighteen hundred fifty (1850) feet to any well completed in or drilling to the same reservoir on the same lease, unitized tract or farm, and no well shall be drilled nearer than six hundred sixty (660) feet to any property line, lease line or subdivision line; provided, however, that the Commission will, in order to prevent waste or to prevent the confiscation of property grant exceptions to permit drilling within shorter distances than herein prescribed whenever the Commission shall have determined that such exceptions are necessary either to prevent waste or to prevent the confiscation of property. When exception to this rule is desired, application therefor shall be filed and will be acted upon in accordance with the provisions of Commission Statewide Rules 37 and 38, which applicable provisions of said rules are incorporated herein by reference.

"The aforementioned distances in the above rule are minimum distances to allow an operator flexibility in locating a well, and the above spacing rule and the other rules to follow are for the purpose of permitting only one well to each eighty (80) acre proration unit.

"In applying this rule, the general order of the Commission with rela-

tion to the subdivision of property shall be observed.

"RULE 2: The acreage assigned to the individual oil well for the purpose of allocating allowable oil production thereto shall be known as a proration unit. No proration unit shall consist of more than eighty (80) acres except as hereinafter provided, and the two farthermost points in any proration unit shall not be in excess of forty two hundred (4200) feet removed from each other; provided, however, that in the case of long and narrow leases or in cases where because of the shape of the lease such is necessary to permit the utilization of tolerance acreage the Commission may after proper showing grant exceptions to the limitations as to the shape of proration units as herein contained. All proration units, however, shall consist of continuous and contiguous acreage which can reasonably be considered to be productive of oil.

"Provided, however, that operators may elect to assign tolerance of not more than eighty (80) acres of additional unassigned lease acreage to a well on an eighty (80) acre unit and shall in such event receive allowable credit for not more than one hundred sixty (160) acres.

"Operators shall file with the Commission certified plats of their properties in said field, which plats shall set out distinctly all of those things pertinent to the determination of the acreage credit claimed for each well; provided that if the acreage assigned to any proration unit has been pooled, the operator shall furnish the Commission with such proof as it may require as evidence that interests in and under such proration unit have been so pooled."

The petitioner does not contend, nor does the opinion say, that the proration unit in

question does not comply with the regulations of the Railroad Commission. The opinion simply assumes, without giving a reason why, that the regulations of the Railroad Commission under which the unit in question was created were not *prescribed by governmental regulations.*

The court, in discussing the provisions of the regulations, does not fully cover all the size units provided in said regulations. Since the authority given by lessor to pool is governed largely by these regulations, it is thought that it will be helpful to more fully analyze them.

At the time the unit in question was formed, Railroad Commission Order No. 6-45, 322 was in effect and governed the Fairway (James Lime) Field. One of the Commission's preliminary findings set out in the order, preceding the adoption of field rules, was an express finding to the effect that certain observations and calculations made with reference to the discovery well in the field had indicated that the well was producing oil in an area outside the radius of a 160-acre circle around the well. From this and other findings the Commission proceeded to adopt proration rules which established a maximum proration unit of 160 acres for which full acreage allowable credit would be given. Thus, it was implicit that the Commission had determined that the basic drainage pattern for the field was 160 acres or, in other words, that a 160-acre unit would be reasonably drained by a single well.

The Commission order did something more. It expressly recognized that smaller units would also be given full acreage allowable credit, if they met certain requirements. One of the provisions of the rules established, in effect, that if an operator had as much as 80 acres in a single lease, 80 acres would then be considered as the minimum proration unit, the inclusion of additional acreage, up to the total maximum of 160 acres, being optional with the operator. But another provision, relating to distance spacing, also established that,

still without the necessity of any hearing or exception, any square tract of 40 acres or more would also serve as an acceptable proration unit, if that were all the acreage the operator possessed in the particular property, and if there had been no illegal subdivision. The 40-acre minimum standard was implicit in the rule that no well be drilled nearer than 660 feet from any property line. Thus, the Commission Order in effect recognized that, without special hearing and exception, the maximum standard proration unit, i.e., the area which could reasonably be drained by a single well, was 160 acres, while the minimum standard unit, i.e., the smallest to be allowed, was 40 acres. Pickens v. Railroad Commission, 387 S.W.2d 35, 38, 39 (Tex. Sup.Ct.1965).

The court's opinion says "The Commission prescribed a unit of 80 acres", inferring that all other size units provided for in said regulations were permitted by the Railroad Commission or permitted by the regulations, I am not sure which. To be sure, an 80-acre unit is prescribed by the regulations. But I do not agree that it is the only unit prescribed. As shown above, the regulations provide for units from 40 acres to 160 acres in size.

The pooling unit in question comes squarely within the limits as to size with the provisions of the governmental regulations just as much so as does the 80-acre unit referred to above.

This brings us to a discussion of the interpretation to be given the proviso of the pooling unit, which we here quote:

"\* \* \* provided that should governmental authority having jurisdiction prescribe or permit the creation of units larger than those specified, units thereafter created may conform substantially in size with those prescribed by governmental regulations."

The first clause of the proviso governs the condition under which the lessee may create units larger than those specified,

(40 acres), that is, when government authority has prescribed rules and regulations for the creation of larger units or when governmental authority has permitted the creation of larger units. Under the facts of this case the governmental authority has prescribed rules and regulations providing for the creation of larger units, but it has not permitted the creation of larger units. No permit was requested nor was one needed. As a general rule the Railroad Commission permits the creation of units only as exceptions to established rules and regulations. The last clause of the proviso governs the size of units created under either prescribed regulations or governmental authority permission. As said above, it is not questioned but that this unit was created in compliance with the established regulations and not by permission of the Railroad Commission as an exception to the regulation.

It has been argued before this court that since the first clause in said proviso uses the term "permit" and the second clause does not use the term, that "prescribed" must necessarily have a special meaning of "required" in order to leave room for permissive units to be formed, and since the last clause did not establish a size for permissive units, no authority was given to form any permissive units. This reasoning seems to be the basis of the court's holding. Under this line of reasoning we wonder why the parties used the term "permit" at all in the first clause of the proviso. It is fundamental that in contracts all the terms used should be given meaning if possible. Should a governmental authority lay down rules and regulations for the creation of larger units, it is reasonable to say the governmental authority has *prescribed*. If the governmental authority allows the creation of a larger unit as an exception to the prescribed rules and regulations it can be said the governmental authority has *permitted* the creation of larger units. In fact, the term "permit" is the universal term applied to authority granted as an exception to regu-

lar rules and regulations governing the development of oil and gas fields. The fact that the word "permit" is not used in the second clause of the proviso does not destroy the import of the word "permit" in the first clause.

This construction of the proviso allows us to give the usual and ordinary meaning to the word "prescribe" as defined by Webster:

"prescribe (L. praescribere, praescriptum, fr.prae before—scribere to write, see scribere.) * * *

"2. To lay down authoritatively as a guide direction or rule of action; to impose as a peremptory order; to dictate; direct; ordain; as, to prescribe regular hours of study. 3. To keep within limits or bounds; to restrain; to confine * * *.

"Syn.—Limit, control, order, guide."

I think that the authority granted by the lessor for pooling necessarily had to be stated in broad and general terms because it could not be foreseen what the circumstances in the future might be, what the regulations of the Railroad Commission might be nor in what terms they might be stated. For that reason a liberal interpretation should be given to the pooling provision to accomplish the purpose for which it was intended, that is, to promote conservation beneficial both to the lessor and the lessee. It can be reasonably concluded that from said pooling provision the parties intended for the authority to pool to extend to any unit size substantially conforming to any unit standard officially established by the Railroad Commission in the exercise of its spacing proration function.

This court, in construing an oil and gas lease in the recent case of Grady L. Fox et al. v. Julia Thoreson, 9 Tex.Sup.Ct.J. 26 (1965), used the following language:

" * * * Another sound rule of interpretation is that language used by

the parties to an oil and gas lease will not be held to impose a special limitation on the grant unless it is clear and precise and so unequivocal in nature that it can reasonably be given no other meaning."

The court's opinion in the instant case has given a narrow and restricted meaning to the pooling provision in question when there is no language in said pooling provision which compels such construction to be placed thereon. So long as the lessor's pooling unit is confined to the size of the pooling units authorized by the rules and regulations of the Railroad Commission, it can reasonably be said that the unit complies in size with the prescribed regulations. This would be a reasonable construction of the pooling provision rather than a strained one.

In Texaco, Inc. v. Letterman, 343 S.W.2d 726, 732 (Tex.Civ.App.1961), the court in construing a pooling provision in an oil and gas lease said:

"That pooling or unitizing of oil and gas leases is a standard practice in the industry can not be questioned. It is equally recognized that unitization is often a more feasible method of operation from an engineering and scientific point of view. Unitization can be said to be advantageous to both lessors and lessees. We think these facts lead to the conclusion that in the absence of clear language to the contrary, pooling clauses should not be construed in a narrow or limited sense."

And in Tiller v. Fields, 301 S.W.2d 185, 187 (Tex.Civ.App.1957), the court said:

"Anticipatory provisions in leases for the committment by the lessee of such leases to unitization, of necessity must be in general terms. Neither the lessor nor the lessee has any way of knowing at the time the lease is taken the facts with respect to which it will be necessary for the lessee to apply his power. It is not practicable for the lessee to await the ascertainment of such facts. He knows from experience that because of the possibility of many changes in ownership of the lessor's interest as time goes on, it may be difficult to effect an agreement if the right to unitize is not included in the lease itself. Phillips Petroleum Co. v. Peterson, 10 Cir., 218 F.2d 926. The Texas courts, as well as other courts, have recognized these basic facts, and have consistently sustained the basic validity of lease pooling provisions and units formed under their authority."

In Phillips Petroleum Co. v. Peterson, 218 F.2d 926, 933, (10th Cir. 1954), the court reasoned as follows:

"Thus, it will be seen that unitization is a conservation measure which benefits both lessor and lessee and tends to prevent waste of a natural resource. * * *

"The practice of unitization by a power granted the lessee in advance, if faithfully carried out, will be fair and profitable both to the lessor and lessee, and is vital to the oil and gas industry in the interests of the conservation of both natural and material resources. It should be upheld, although the grant of power is in general terms, because it is subject to implied terms that will prevent arbitrary and unfair dealing, will require compliance with the implied covenants in the lease for the benefit of the lessor and will impose a rigid standard of good faith on the part of the lessee."

In construing this pooling provision of the oil and gas lease we should recognize that this does not only affect the litigants involved here, but affects the oil industry as a whole for the simple reason that the form of the pooling unit used is in wide

use in Texas and has been for many years.[1]

The pooling clause which we have before us for construction has been in use in Texas for many years. Tolerance type proration units have been prescribed for various oil and gas fields in Texas for many years. The result has been the creation of many pooled units in numerous fields which are now shadowed. The confusion, uncertainty, and possible title failure is not limited to the lessee who may have formed the unit. It extends to royalty owners in the unit, overriding royalty owners, and to some extent to the purchasers of production and the financial institutions which furnish capital for the development and enjoyment of the mineral resources. Furthermore, there is affected by the court's opinion the new Texas Compulsory Pooling Act by the Legislature, Art. 6008c, Rev.Civ.Stat.Ann. (1965). See discussion by Ernest E. Smith, Tex.Law Rev. Vol. 43 pp. 1003–1021.

I think a reasonable construction of the pooling clause does not require that we strike it down, and I would affirm the judgments of the trial court and Court of Civil Appeals.

GRIFFIN, J., joins in this dissent.

POPE, Justice (dissenting).

The fault that I find with our holding in this case is that we are trying to fit the meaning of terms used by private parties to a lease into a supposed technical terminology used by the Railroad Commission in making its rules and orders. This is the sequence of events. First the parties made the oil and gas lease and in it they provided:

"Units pooled for oil hereunder shall not substantially exceed 40 acres each in area, and units pooled for gas hereunder shall not substantially exceed in area 640 acres plus a tolerance of 10% thereof, provided that should governmental authority having jurisdiction *prescribe or permit* the creation of units larger than those specified, units thereafter created may conform substantially in size with those *prescribed* by governmental regulations."

Several years later the Commission order was passed which stated:

" * * * No proration unit shall consist of more than eighty (80) acres except as hereinafter provided, * * * "Provided, however, that operators may elect to assign tolerance of not more than eighty (80) acres of additional unassigned lease acreage to a well on an eighty (80) acre unit and shall in such event receive allowable credit for not more than one hundred sixty (160) acres."

The thrust of our opinion is that the Commission "prescribes" certain things, and it also "permits" certain things. The majority then tries to determine which the Commission did in this instance and holds that the Commission "prescribed" eighty acres but did not "prescribe" 160 acres. The fact is that the Commission passed its rules without regard to whether it was "prescribing" or "permitting," as those terms are used by the private contracting parties. The term "permitted" actually does two things: It permits but it also prohibits all that is beyond that which is permitted. Every permit carries an inherent prescription, proscription, and prohibition of things beyond the permit. What the Commission did in passing its Rule 2 was to authorize certain units. Those units could be formed

---

1. The form of pooling provision is in lease forms in Walker, Cases on Oil and Gas, Vol. 2, Second form following page 895, publication 1948, lease form dated April, 1946; Stayton Texas Forms, 1960, Sec. 4026, Vol. 7, p. 254; Huie, Walker and Woodward, Oil & Gas, American Casebook Series, 1960, first form in the Appendix, p. 807, offered by the authors as a form "selected for the purpose of acquainting the student with the general nature of the instruments discussed in the cases," and printed by permission of Pound Printing & Stationery Co., Houston; Williams, Oil & Gas Law, 1962, Vol. 4, p. 635, Sec. 699.7.

**334**

without any further recourse to the Commission. To the extent that Rule 2 was complied with, a unit was authorized. To the extent that it was beyond what Rule 2 authorized, it was prohibited. To the extent that it was prohibited, it was "prescribed," if we want to squeeze the Commission order into the contractual mold. In my opinion the word "prescribed" is more applicable to the 160-acre unit than the 80-acre unit because the only prohibition or direction is against creating a unit of more than 160 acres.

I respectfully dissent.