**CIRCLE DOT RANCH, INC. and Euline Walser, Appellants,**

v.

**SIDWELL OIL AND GAS, INC., et al., Appellees.**

No. 07–94–0076–CV.

Court of Appeals of Texas, Amarillo.

Jan. 26, 1995.

Rehearing Overruled Feb. 21, 1995.

Lemon Shearer Ehrlich Phillips & Good (Mitchell G. Ehrlich and Robert D. Lemon), Perryton, for appellants.

Templeton Smithee Hayes & Fields (Joe W. Hayes and Robert L. Templeton), Amarillo, for appellees.

Before REYNOLDS, C.J., and DODSON and BOYD, JJ.

REYNOLDS, Chief Justice.

Circle Dot Ranch, Inc. and Euline Walser perfected this appeal to contend the trial court improperly directed a verdict against them in their action to cancel a voluntarily pooled gas unit and to recover royalties under their lease based upon the alleged bad faith of lessees Sidwell Oil and Gas, Inc., et al. (Sidwell).[1] By a cross-point, Sidwell asserts error in the trial court's overruling of its motion for partial new trial on the issue of attorney's fees. For the reasons to be expressed, we will reverse and remand.

Circle Dot Ranch, Inc. and Euline Walser (collectively, Circle Dot) owned all of the oil, gas and other minerals underlying Section 3, Block A–5, B S & F Survey, in Wheeler County, containing 643.23 acres (the Circle Dot property). In September of 1987, an oil

---

1. Named as the other lessee-appellees were R.C. Callan; Auslin Exploration Company, a corporation; James Robert Hill, Trustee of the Houston & Emma Hill Trust Estate; Klabzuba Oil and Gas Company, P.C. Ltd.; A. Craig Asher; Don Bagwell; Peter M. Boyce; W.P. Buckthal; Lawrence A. Fleishman; G.J. Long; J.G. O'Brien; Irvin Wall; El Paso Oil Company; Peggy Masterson Stinnett, Trustee of the Bennet Masterson Trust # 1; Nabob Production Company; United Energy Corporation; Don Asher; Brad Bingham; John R. Buckthal; R.C. Callan, Jr.; James R. Hill; Virginia Glenn Hill Lattimore; W.M. Quackenbush; A.D. Weatherly; and Doyle G. Whitaker.

Named as royalty owner lessee-appellees were Willie Mae Heath, and Webster Heath; American United Life Insurance Company; Kent Herbert McLaughlin, Administrator of the Estate of Keith L. McLaughlin, Deceased; Edith Mae McLaughlin; Zula Scott Trust; Amarillo National Bank, Trustee of the Sanders Brothers Mineral Trust; Betty Ann Baggerman Kotora; Caroline O. Baggerman Couts; Mildred Baggerman Miller; Vernon Ernest Baggerman; Isaac Ruben Baggerman; Margaret Lorene Baggerman; Cornalus Nace Baggerman; Franklin Delan Baggerman; Irene Elizabeth Baggerman; Roselle Vernice Baggerman Collinsworth; James Robert Baggerman; and Dorothy M. Sheriff.

and gas lease covering the acreage (the Circle Dot lease) was obtained from Circle Dot by Vise Energy, Inc. The lease was for a primary term of three years and provided for a 3/16ths royalty payable to lessors. By paragraph six of the lease, the lessee was

> granted the right and option to consolidate the lands covered hereby, or any portion or portions thereof, with other lands ... to form a unit for the production of (1) oil and casinghead gas, or (2) dry or gas well gas, ... the unit or units to be in such shape and of such dimensions as Lessee may elect; provided that such unit ... formed for the production of oil and casinghead gas shall not exceed forty (40) acres in surface area plus a tolerance of ten per cent (10%) thereof; and any such unit formed for the production of dry gas or gas well gas ... shall not exceed six hundred forty (640) acres in surface area plus a ten per cent (10%) tolerance thereof.

Sidwell subsequently obtained the lease from Vise Energy, Inc.

On 5 July 1988, a well was staked 467 feet from the south and west lines of the Circle Dot property in the Candice (Morrow) Field. Prior to the initiation of drilling efforts, Sidwell applied on 11 July 1988 to the Railroad Commission for a permit to drill a gas well by signing and submitting form W–1, to which was attached a plat showing that all of section 3, containing 643.23 acres, was the designated drilling unit for the Circle Dot 103 well, and that it was not a pooled unit. Drilling operations were commenced and completed in the Upper Shelton sand by 17 August 1988, and production of gas was obtained in October of 1988.

In April of 1989, more than six months after production had been procured, Sidwell executed a "Designation of Consolidated Gas Leasehold Estate" creating the Circle Dot Ranch No. 1 Gas Unit (the Circle Dot unit), which became effective when it was filed for record on 16 May 1989. The unit was irreg-

ular in shape, its diagonal corners being in excess of 11,000 feet apart, and contained 668.23 acres. Included in the pooled 668.23 acres were 123.23 acres under the Circle Dot lease, carved out of the southwest corner of the Circle Dot property where the Circle Dot 103 well was located, and 545 acres covered by six leases on three contiguous sections of land. Except for the consolidation, the primary term of one of the six leases would have expired in three months, and the primary terms of four of the leases would have expired within 18 months.

The creation of the Circle Dot unit was founded on the right of consolidation contained in paragraph 6 of the Circle Dot lease. As a result of the formation of the unit, Circle Dot's royalty interest in gas produced from the well was reduced from 3/16ths to 123.23/668.23 of 3/16ths.[2]

On 2 November 1989, Circle Dot filed its original petition, alleging that Sidwell had failed to exercise good faith in the formation of the Circle Dot unit, and seeking to cancel the pooled gas unit and to recover a full 3/16ths royalty under the Circle Dot lease covering production from the Circle Dot 103 well.[3] Sidwell counterclaimed, seeking a declaratory judgment with respect to (1) the validity of the Circle Dot unit, including a declaration of who was entitled to past and future royalties from the Circle Dot gas well or, in the alternative, reformation of the Circle Dot unit; (2) its entitlement to the disputed royalty proceeds under the terms of the lease; and (3) its right to recover attorney's fees.

In addition to the earlier recounted events, there were adduced, through pretrial discovery and during the trial before a jury, Sidwell's admissions that it was not necessary to create the Circle Dot unit to obtain a full gas allowable for the Circle Dot 103 well, and that acres productive from the Upper Shelton sand under section 3 were excluded from

---

2. By Circle Dot's calculation, its royalty interest in gas produced from the Circle Dot 103 well was reduced from .1875 to .03457735, a reduction of approximately 81%.

3. Prior to trial, Sidwell conceded that Circle Dot was entitled to a 3/16ths royalty on all gas pro-

duced from the Circle Dot 103 well up to the time the Unit Designation was filed on 16 May 1989, and the amount was calculated and paid to Circle Dot on the eve of trial. Now, Circle Dot seeks recovery of a 3/16ths royalty on all gas production since the Unit Designation was filed.

the Circle Dot unit; testimony from John Vise, who secured the original Circle Dot lease, that there was no pooling of any section in the Candice (Morrow) Field except for pooling within one section; and Vise's testimony that he was not aware of any other gas unit in Wheeler County having diagonal corners 11,000 feet apart. Sidwell also admitted that no Form P–12, Certificate of Pooling Authority, for the Circle Dot unit had been filed with the Railroad Commission; however, upon Sidwell's objection, the admission was excluded by the trial court.

When Circle Dot had presented its evidence, the parties stipulated the issue of attorney's fees would be tried to the court alone. Then, Sidwell orally moved for a directed verdict on the ground that Circle Dot had produced no evidence to meet its burden of proof that it, Sidwell, had failed to exercise good faith in the formation of the Circle Dot unit. The court granted the motion and, afterwards, denied Sidwell's claim for attorney's fees, resulting in the rendition of a take-nothing judgment on all claims. Sidwell moved for a partial new trial on the issue of attorney's fees, but its motion was overruled. This appeal ensued.

With two points of error, Circle Dot contends the trial court erred in (1) withdrawing the case from the jury and directing a verdict against them, because a fact issue had been raised with respect to whether Sidwell had exercised its authority to pool in fairness and good faith, and (2) excluding Sidwell's admission that no P–12 plat was filed with respect to the Circle Dot unit. By a cross-point of error, Sidwell charges the trial court with error in overruling its motion for a partial new trial on the issue of its entitlement to the recovery of attorney's fees.

The cause was pleaded and defended, tried and decided, and briefed and argued on appeal, on the contested issue whether Sidwell exercised its pooling authority in fairness and good faith, taking into account the interests of both the lessor and lessee. *Elliott v. Davis*, 553 S.W.2d 223, 227 (Tex.Civ.App.—Amarillo 1977, writ ref'd n.r.e.). However, during oral argument upon submission of the appeal, Sidwell posed a novel challenge to the validity of the duty of good faith imposed on lessees in pooling circumstances by *Elliott* and other authorities. Sidwell proposed that the duty of good faith applied to pooling determinations was rejected in *Amoco Production Co. v. Alexander*, 622 S.W.2d 563, 568 (Tex.1981), by the pronouncement that "[t]he standard of care in testing the performance of implied covenants by lessees is that of a reasonably prudent operator under the same or similar facts and circumstances." *Id.* at 567–68. We granted leave to file, and Sidwell and Circle Dot submitted, post-submission briefs for our determination of the nature and extent of the duty imposed on a lessee exercising the pooling powers granted in an oil and gas lease.

At the outset, we notice that the paragraph 6 consolidation provision is an express covenant, which is independent in nature because actual performance by the lessee is not dependent on any performance by the lessor. Black's Law Dictionary 363 (6th ed. 1990). Historically, Texas courts, in considering the lessee's exercise of a pooling option granted by such a covenant, have held the lessee to a standard of good faith in making a determination to pool. *Vela v. Pennzoil Producing Co.*, 723 S.W.2d 199, 206 (Tex.App.—San Antonio 1986, writ ref'd n.r.e.); *Elliott v. Davis*, 553 S.W.2d at 226; *McCarter v. Ransom*, 473 S.W.2d 235, 239 (Tex.Civ.App.—Corpus Christi 1971, no writ); *Banks v. Mecom*, 410 S.W.2d 300, 303 (Tex.Civ.App.—Eastland 1966, writ ref'd n.r.e.); *Tiller v. Fields*, 301 S.W.2d 185, 190 (Tex.Civ.App.—Texarkana 1957, no writ). *Accord Smith v. Killough*, 461 S.W.2d 510, 513 (Tex.Civ.App.—Eastland 1970, writ ref'd n.r.e.) (holding that to cancel a unitization declaration, the lessor had to prove the lessee acted in bad faith). In holding the lessee to a standard of good faith, some of the authorities characterized the standard as an implied requirement, *see, e.g., Elliott v. Davis*, 553 S.W.2d at 226; *Tiller v. Fields*, 301 S.W.2d at 190, or an implied obligation, *see, e.g., McCarter v. Ransom*, 473 S.W.2d at 239, but none of them designated the good faith standard as an implied covenant.

Insofar as the parties' and our own research has shown, the Supreme Court has not directly articulated the duty or standard

of care of a lessee in exercising the pooling power. However, as is evident from the writ histories of the decisions just cited, the Supreme Court has not disapproved the imposed requirement or obligation of good faith. Indeed, the Court has noted, with some indication of approval, the contention that good faith is the standard by which the lessee's performance is to be measured. *Jones v. Killingsworth,* 403 S.W.2d 325, 328 (Tex.1966); *see also id.* at 332 (Hamilton, J., dissenting) (citing language that a pooling provision "will impose a rigid standard of good faith on the part of the lessee").

Subsequent to these decisions, the Supreme Court stated in *Amoco Production Co. v. Alexander,* that the terms "obligation," "duty," and "covenant" have been used to describe the performance required of a lessee, and noticed that courts have held covenants are implied when an oil and gas lease fails to express the lessee's obligation to develop and *to protect the lease.* 622 S.W.2d at 567. The Court also observed that implied covenants are categorized according to specific applications to particular controversies. *Id.* at 567 n. 1. The *Alexander* court held that the standard of care for "the performance of implied covenants by lessees is that of a reasonably prudent operator under the same or similar facts and circumstances." *Id.* at 567–68. However, none of the categories listed in *Alexander's* marginal note 1 includes an implied covenant regarding a pooling provision, unless one is implicit in the obligation to protect the lease.

■ The application of the principles addressed by the foregoing authorities leads us to the conclusion that the bare language of the express covenant of consolidation implies a covenant of the standard of care for the performance of the lessee in the exercise of his pooling authority, which is legally necessary to effect the purposes for which the lease was made. *Accord Freeport Sulphur Co. v. American Sulphur Royalty Co.,* 117 Tex. 439, 6 S.W.2d 1039, 1041–42 (1928). The purposes of the lease, of course, are the production of oil and gas with payment of royalty to the lessor. It follows that under the implied covenant, the lessee's standard of care mandated by *Alexander* "is that of a

reasonably prudent operator under the same or similar facts and circumstances." 622 S.W.2d at 567–68.

■ The resolution of the standard of care for the lessee's performance does not mean that this cause was tried on the wrong theory in the trial court. Although the facts and circumstances in a given situation of pooling will dictate the obligations of a reasonably prudent operator, *accord Amoco Production Co. v. Alexander,* 622 S.W.2d at 568, the authorities agree that the lessee's primary obligation is to exercise the pooling power "in good faith, taking into account the interests of both lessee and lessor." *See, e.g., Elliott v. Davis,* 553 S.W.2d at 226–27 (quoting 4 E. Kuntz, The Law of Oil and Gas § 48.3, p. 218 (1972)). This primary obligation is the one by which Sidwell's performance was measured when the parties tried the cause.

■ Preliminarily, we observe that subsequent to the submission, Sidwell moved, without objection from Circle Dot, for this Court to take judicial notice of the file of the Railroad Commission of Texas regarding Circle Dot's complaint that Sidwell did not comply with the Commission's Rule 40(a) by filing a Form P–12 with a certified plat of the pooled unit. Absent an objection by Circle Dot, the motion was granted, and we judicially noticed the hearing examiner's adjudicative fact that "the Commission would not require Sidwell to file a Form P–12 under these facts." Tex.R.Civ.Evid. 201. No appeal was taken from the adjudication. As a consequence, the trial court cannot be faulted for excluding Sidwell's admission that a Form P–12 was not filed with respect to the Circle Dot Unit. Circle Dot's second point of error is overruled.

■ Circle Dot's initial contention—that the trial court erred in withdrawing the cause from the jury and directing a verdict against it—is tested by determining whether the evidence raised any issue of material fact. If the evidence, viewed in the light most favorable to Circle Dot, the party against whom the verdict was directed, and disregarding all contrary evidence and inferences, raised an issue of material fact, the court erred in directing the verdict. *Garza v.*

*Maverick Market, Inc.,* 768 S.W.2d 273, 276 (Tex.1989). The material fact in this cause is whether Sidwell exercised the pooling option as a reasonably prudent operator would do under the same or similar circumstances by, among other things, using good faith, taking into account its and Circle Dot's interests. On this record, there was some evidence of probative force to raise the fact issue; thus, the judgment must be reversed and the cause remanded for the jury's determination. *Qantel Business Sys. v. Custom Controls,* 761 S.W.2d 302, 304 (Tex.1988).

The right and option granted Sidwell in the Circle Dot lease to consolidate the leased lands with other lands involved both pooling and unitization. Technically, "[p]ooling means the bringing together of small tracts sufficient for the granting of a well permit under applicable spacing rules," and "[u]nitization means the joint operation of all or some part of a producing reservoir." 6 H. Williams and C. Meyers, Oil and Gas Law § 901 (1994). Generally, the question of good faith or bad faith pooling and unitization is a fact issue to be resolved by the trier of fact. *Vela v. Pennzoil Producing Co.,* 723 S.W.2d at 205.

The Circle Dot lease, including all of section 3 and containing 643.23 acres, covered a tract sufficient for the granting of a well permit to Sidwell to drill the Circle Dot 103 gas well. The right and option granted Sidwell in the lease to consolidate the leased lands with other lands was "to form a unit for the production of (1) oil and casinghead gas, or (2) dry or gas well gas." Although Sidwell had a leased tract sufficient for the granting of the well permit, the record does not show that the pooled unit was thereafter formed to secure production of oil or gas or for the joint operation of a producing reservoir. Thus, the record does not show an expressed interest of Sidwell and Circle Dot to be served by the pooled unit.

By implication, the record reveals that the consolidation by an irregular configuration served Sidwell's interest in extending the life of leases expiring in the near future on five of the other six consolidated tracts, but that implication is not determinative of the question of good faith. *Elliott v. Davis,* 553 S.W.2d at 227. However, the record affirmatively shows that as a result of the pooled unit, Circle Dot's interest in the production was reduced by 81 percent, and that acres productive from the Upper Shelton sand under section 3 were excluded, which facts bear upon, but are not determinative of, the question of good faith. *Id.*

In brief, we deem the evidence raised the material fact issue whether Sidwell exercised the right and option of pooling as a reasonably prudent operator would do under the same or similar circumstances. Consequently, the raising of the fact issue precluded the grant of a directed verdict on the theory that Circle Dot had not presented any evidence to meet its burden of proof. Circle Dot's first point of error is sustained.

The sustainment requires that the judgment be reversed and the cause be remanded for resolution of the material fact issue. *Qantel Business Sys. v. Custom Controls,* 761 S.W.2d at 304. The parties may amend their pleadings if they consider it appropriate. *Morrow v. Shotwell,* 477 S.W.2d 538, 542 (Tex.1972).

The sustainment also removes the foundation for Sidwell's cross-point concerning its entitlement to attorney's fees as the prevailing party. The cross-point is overruled.

Accordingly, the judgment is reversed, and the cause is remanded to the trial court.

DODSON, J., concurs.

DODSON, Justice, concurring.

I concur in the results reached by the lead opinion. However, I am not persuaded that the reasonably prudent operator standard stated in *Amoco Production Co. v. Alexander,* 622 S.W.2d 563, 568 (Tex.1981) applies to the lessee's exercised option to pool. The lessee's exercise of an option to pool was not before the court in *Alexander.*

In general, Texas courts have consistently held that a lessee, pooling under a lease pooling clause, is "subject to the *implied requirement* that he act *fairly* and *in good faith.*" (Emphasis added.) *Tiller v. Fields,* 301 S.W.2d 185, 190 (Tex.Civ.App.—Texarkana 1957, no writ). To the same effect is

*Elliott v. Davis*, 553 S.W.2d 223, 226 (Tex. Civ.App.—Amarillo 1977, writ ref'd n.r.e.) and *Banks v. Mecom*, 410 S.W.2d 300, 303 (Tex.Civ.App.—Eastland 1966, writ ref'd n.r.e.). It is said that even though the lessee's interests frequently conflict with those of his lessor, the lessee must exercise the power to pool "in fairness and in good faith *taking into account the interests of both the lessor and the lessee.*" (Emphasis added.) *Elliott v. Davis*, 553 S.W.2d at 226–27.

As stated in the lead opinion, the appellants owned all of the oil, gas and other minerals underlying Section 3, Block A–5, B S & F Survey, in Wheeler County containing 643.23 acres of land. In September of 1987, the appellants executed on its section of land an oil, gas, and other minerals lease to Vise Energy, Inc. The lease provided a 3/16ths royalty payable to the appellants-lessors.

Sidwell Oil and Gas, Inc. acquired the lease, and drilled and completed a gas well on the property under a 640 acre well spacing permit granted by the Texas Railroad Commission. After the gas well had produced for approximately six months, Sidwell executed a "Designation of Consolidated Gas Leasehold Estate" creating the Circle Dot Ranch No. 1 Gas Unit. As stated in the lead opinion:

> The unit was irregular in shape, its diagonal corners being in excess of 11,000 feet apart, and contained 668.23 acres. Included in the pooled 668.23 acres were 123.23 acres under the Circle Dot lease, carved out of the southwest corner of the Circle Dot property where the Circle Dot 103 well was located, and 545 acres covered by six leases on three contiguous sections of land. Except for the consolidation, the primary term of one of the six leases would have expired in three months, and the primary terms of four of the leases would have expired within 18 months.

Before Sidwell's pooling, Circle Dot was entitled to 3/16ths of all of the royalty for the gas produced from the well located on its property. After the pooling, Circle Dot would receive only 3/16ths of 123.23/668.23 or only 18.4% of the royalty for gas produced from its well.

In essence, by its pooling arrangement, Sidwell has appropriated 81.6% of Circle Dot's royalty from the gas well on Circle Dot's property and distributed the percentage to the royalty owners of the 545 acres consolidated with Circle Dot's 123.23 acres. In that regard, I point out that the record shows more than 25% of the 545 acres pooled with Circle Dot's 123.23 acres is under a lease which provides for only a 1/8th royalty payment rather than the 3/16ths royalty payable under the Circle Dot lease. This percentage differential equates to a substantial royalty payment savings to Sidwell under the pooling arrangement. By contrast, we are not directed to, nor have we found any benefit accruing to Circle Dot from the pooling arrangement. Likewise, we are not offered an explanation for the pooling arrangement other than a claimed unfettered legal right to pool as prescribed in paragraphs six and seven of the lease. Nevertheless, the pooling option is subject to the implied requirement that it be exercised in fairness and in good faith, taking into account the interests of both the lessor and lessee. In that connection, the lessee is obligated to protect the leasehold estate rather than destroy it.

Also, I am not persuaded that circumstances in this instance present a question of fact for the fact finder. I acknowledge that this court stated in *Elliott v. Davis*, 553 S.W.2d at 226 that "[t]he general rule is that the question of what constitutes good faith in the circumstances of a particular case is one of fact to be resolved by the fact finder." However, the cited authorities simply do not support that determination. I submit that the fairness and good faith issue is like other legal propositions in that it may be conclusively established when reasonable minds could not differ. *See Calvert, Robert W.*, "No Evidence" and "Insufficient Evidence" Points of Error, 38 Tex.L.Rev. 361 (1980).

I believe the instructed verdict would have been more accurately directed in favor of Circle Dot (the Lessors) rather than Sidwell (the Lessee). The good faith requirement implied by case law requires the lessee to take into account the interests of both the lessor and lessee. In this instance, it cannot be said that the lessee, in fairness and in

good faith, protected and took into account the lessors' interest when the lessee (1) destroyed the lease, (2) appropriated 81.6% of the lessors' royalty and distributed the royalty to others not in privity with the lessors, (3) perpetuated six other leases held by the lessee on property unrelated to the lessors' property and (4) reduced the lessee's overall royalty payment by including property in the pooled unit, which provided for a lower royalty payment rate.

In essence, as between the lessors and lessee, Sidwell (the Lessee) received all the benefits from the pooling arrangement and the lessors none, and in particular, the lessors lost 81.6% of their royalty. Under these circumstances, Circle Dot conclusively established unfairness and lack of good faith as a matter of law. Nevertheless, since we do not have a predicating motion for rendition before us, I concur that the trial court's judgment must be reversed and the cause remanded to the trial court.