NUMBER 13-02-136-CV

COURT OF APPEALS

THIRTEENTH DISTRICT OF TEXAS

CORPUS CHRISTI - EDINBURG
                                                                                                                      

MISSION RESOURCES, INC., F/K/A
BELLWETHER EXPLORATION CO., 
COASTAL OIL & GAS CORP., AND 
COASTAL OIL & GAS USA, L.P.,                                      Appellants,

v.

GARZA ENERGY TRUST, ET AL.,                                             Appellees.
                                                                                                                                      

On appeal from the 332nd District Court of Hidalgo County, Texas.
                                                                                                                      

O P I N I O N

Before Justices Hinojosa, Yañez and Garza 
Opinion by Justice Garza

This is an appeal from a judgment of approximately $14 million against appellant,
Coastal Oil and Gas Corporation (“Coastal”), now known as El Paso Production Oil & Gas
Company, following a jury trial in Hidalgo County.


 Appellees, plaintiffs below, are
members of the Garza and Salinas families. They are Coastal’s lessors in several
undivided mineral leases in Share 13, the subject matter of this suit. Appellees asserted
multiple causes of action at trial. They alleged Coastal committed a subsurface trespass
on Share 13 through the fracture treatment of a well located on an adjacent tract of land
known as Share 12. They also claimed that Coastal breached the duty of good faith
pooling, as well as the implied covenants to market, develop the leasehold, and protect
against drainage. 
Following a trial, the jury returned a verdict in favor of appellees on each of their
claims except breach of the implied covenant to market. In connection with its trespass
finding, the jury found that Coastal had acted with malice and awarded $10 million in
punitive damages. The jury also found that Coastal had committed “felony theft,” which
rendered inapplicable the statutory cap on punitive damages. Coastal now raises fourteen
issues on appeal. We sustain Coastal’s thirteenth issue regarding attorneys’ fees, reverse
the judgment as to that issue, and affirm the judgment in all other respects. 
Background 
Hydraulic fracturing is a secondary recovery method used to increase production
from oil and gas wells. During a “frac job,” a thick liquid is pumped into the well under great
pressure to fracture or break up rock formations that trap oil or gas. A mixture, often
composed of sand, is then pumped into the fracture to prop the fracture open. The oil and
gas drain through the fractures out of the reservoir to the wellbore, allowing for the capture
of reserves that would otherwise not be produced.
Appellees’ claim for subsurface trespass is based on Coastal’s 1996 “fracing” of the
Coastal Fee No. 1 well. The Coastal Fee No. 1 is located on Share 12, adjacent to the
southwest corner of Share 13 at a location approved by the Railroad Commission. Coastal
owns both the surface and mineral estates of Share 12. Appellees own the surface of
Share 13 and, through their leases with Coastal, a royalty interest in the Share 13 mineral
estate. Coastal is the lessee of the Share 13 mineral estate. Appellees alleged that
Coastal’s fracing of the Coastal Fee No. 1 well (“the well”) created a subsurface fracture
or crack two miles underground that crossed the lease line and drained gas and gas
condensate from Share 13. The jury awarded appellees $1 million for subsurface
trespass, but the trial court reduced the award to $543,776 to conform to the evidence. I. Subsurface Trespass by Hydraulic Fracture Stimulation Treatment of a
Well 
 
In its first issue, Coastal contends that Texas does not recognize a cause of action
for subsurface trespass based on the hydraulic fracture stimulation treatment of a well. 
According to Coastal, no Texas court has ever held that “fracing” can support a cause of
action for trespass damages. Coastal notes that two Texas cases have discussed fracture
treatments but maintains that both cases did so only indirectly. See Gregg v. Delhi-Taylor,
Co., 344 S.W.2d 411 (Tex. 1961); Geo-Viking, Inc. v. Tex-Lee Operating Co., 817 S.W.2d
357 (Tex. App.—Texarkana 1991), writ denied per curiam, 839 S.W.2d 357 (Tex. 1992). 
Based on this precedent, or lack thereof, Coastal asks this Court to reject the trespass-by-fracing theory. We reach the opposite conclusion. The Texas Supreme Court has held
that fracing can be a subsurface trespass. See Gregg, 344 S.W.2d at 416. To the extent
our sister court reached the opposite conclusion in Geo-Viking, it is in conflict with the
Texas Supreme Court and we decline to follow it. See Geo-Viking, 817 S.W.2d at 364. 
In Gregg, the issue was whether the trial court, rather than the Railroad
Commission, had primary jurisdiction to grant injunctive relief to preserve the status quo
when the plaintiff’s neighbor was about to frac a well close to the property line. Gregg, 344
S.W.2d at 412. The plaintiff claimed that the fracture treatment would be a subsurface
trespass. Id. at 415. The defendant denied any wrongdoing and further argued that the
case should be heard first by the Railroad Commission. Id. The supreme court ruled
against the defendant and held that the trial court had jurisdiction because the Railroad
Commission could not make trespass legal. Id. In a passage that Coastal describes as
dicta, the supreme court noted that the plaintiff’s allegations were “sufficient to raise an
issue of whether there is a trespass.” Id. at 416.
We conclude that the supreme court’s statement cannot be discounted entirely as
dictum, if it is dictum at all. The Gregg decision hinged on the supreme court’s conclusion
that fracing can be a subsurface trespass. According to the court, “[t]o constitute a
trespass, ‘entry upon another’s land need not be in person, but may be made by causing
or permitting a thing to cross the boundary of the premises.” Id. (quoting Glade v. Dietert,
295 S.W.2d 642, 645 (Tex. 1956)). If the court had concluded that fracing could not be
a trespass, it would have simply dismissed the case and allowed the Railroad Commission
to resolve the dispute. But the court did not do so. Id. It held that the trial court had
jurisdiction—and that the Railroad Commission did not—because the case involved a tort
(i.e., trespass). According to the opinion, fracing can create a subsurface trespass if “the
invasion alleged is direct and the action taken is intentional.” Id.
The Texas Supreme Court did not revisit the trespass-by-fracing issue until three
decades later, when the Texarkana court issued its opinion in Geo-Viking. Geo-Viking, 817
S.W.2d at 359. In Geo-Viking, an oil well driller named Tex-Lee brought a DTPA claim
against a fracing company called Geo-Viking for improperly performing a fracture treatment
on a well and failing to increase production. Id. The jury awarded Tex-Lee damages for
oil and gas that would have been produced if the frac treatment had been performed
properly. Id. at 363–64. On appeal to the Texarkana court, Geo-Viking argued that the
damages awarded to Tex-Lee were excessive because, if completed as designed, the frac
job would have crossed the lease lines and trespassed on a neighboring tract. Id. Geo-Viking maintained that Tex-Lee should not be allowed to recover damages for oil and gas
that would have been improperly drained by a trespass into a neighboring lease. Id. 
According to Geo-Viking, the trial court should have instructed the jury not to include in its
damage calculations any oil and gas drained from the adjoining tract. Id. Citing “the rule
of capture,” the court of appeals rejected Geo-Viking’s argument that fracing could create
a subsurface trespass:This rule [of capture] permits the owner of a tract to drill as many wells on his
land as the Railroad Commission will allow and provides that he is not liable
to adjacent land owners whose lands are drained as a result of his
operations. The remedy of an injured land owner in such circumstances is
generally said to be self-help. Id. at 364. 
          Initially, the supreme court reversed the Texarkana court, stating that fracing beyond
lease lines did constitute subsurface trespass, Geo-Viking, Inc. v. Tex-Lee Operating Co.,
No. D-1678, 1992 Tex. LEXIS 40, *1 (Tex. 1992) (per curiam); however, the court later
withdrew its opinion, denied the writ, and stated: “We should not be understood as
approving or disapproving the opinion of the court of appeals analyzing the rule of capture
or trespass as they apply to hydraulic fracturing.” Geo-Viking, 839 S.W.2d at 798. Thus,
in the end, the Geo-Viking holding went unreviewed by the supreme court.
          Gregg and Geo-Viking appear to conflict: Gregg held that fracing could be a
subsurface trespass, and Geo-Viking implied that it could not. This Court will not endeavor
to reconcile the conflict. Instead, we follow Gregg as it is not for this Court to declare it
devoid of precedential value, as Gregg remains the law. Coastal’s first issue is overruled. 
II. Standing to Sue for Subsurface Trespass
          In its second issue, Coastal contends that appellees lack standing to sue because,
as royalty interest owners, they lack a possessory interest in the mineral estate. See H.G.
Sledge, Inc. v. Prospective Inv. and Trading Co., Ltd., 36 S.W.3d 597, 604 (Tex.
App.—Austin 2000, pet. denied) (“Royalty and overriding interests have no possessory
right or interest in a tract.”). According to Coastal, only a party with a possessory interest
in a mineral estate has standing to sue for subsurface trespass. Coastal cites Pentagon
Enters. v. Southwestern Bell Tel. Co., 540 S.W.2d 477, 478 (Tex. Civ. App.—Houston
[14th Dist.] 1976, writ ref’d n.r.e.) and argues that because appellees have royalty interests
and not possessory interests, they have no claim for trespass, though they might have a
claim for breach of the implied covenant to protect against drainage. 
          Standing to sue is a threshold inquiry. M.D. Anderson Cancer Ctr. v. Novak, 52
S.W.3d 704, 708 (Tex. 2001) (“Standing is a prerequisite to subject-matter jurisdiction, and
subject-matter jurisdiction is essential to a court’s power to decide a case.”). In general,
a plaintiff has standing to sue if the plaintiff has suffered an injury that was caused by the
defendant and is likely to be remedied by the relief requested. MET-Rx USA, Inc. v.
Shipman, 62 S.W.3d 807, 810 (Tex. App.—Waco 2001, pet. denied); see also Brown v.
Todd, 53 S.W.3d 297, 305 (Tex. 2001) (citing Tex. Workers’ Compensation Comm’n v.
Garcia, 893 S.W.2d 504, 516–17 (Tex. 1995)). If the plaintiff has no standing, the court
lacks subject matter jurisdiction over the plaintiff’s claim and must dismiss it. Tex. Ass’n
of Bus. v. Tex. Air Control Bd., 852 S.W.2d 440, 443–46 (Tex. 1993); see also Douglas v.
Delp, 987 S.W.2d 879, 882 (Tex. 1999) (“Without subject matter jurisdiction, courts may
not address the merits of a case.”). 
          Although Coastal maintains that appellees have no standing to sue, it has cited no
case holding that royalty interest owners cannot sue for trespass. The only case cited by
Coastal that arguably addresses the issue of standing held that a company could not sue
or recover damages for a trespass that occurred before it acquired title to and possession
of the property that was the subject of the trespass claim. See Pentagon Enters., 540
S.W.2d at 477–78.


 Even assuming that Pentagon Enters. dealt with the issue of standing,
it is distinguishable from the instant case. Here, appellees owned a real property interest
against which Coastal trespassed. Unlike the plaintiff in Pentagon Enters., appellees
owned their interest at the time of the trespass. See id. This case can be further
distinguished from Pentagon Enters. because Pentagon Enters. did not involve royalty
interest owners and in no way purported to decide whether a royalty owner can sue for
trespass. See id. 
          Appellees have alleged an injury in the form of a subsurface intrusion by Coastal
that caused drainage of gas and gas condensate in which appellees have a royalty
interest. Appellees’ injury is likely to be redressed by the relief requested (i.e., money
damages) because appellees’ injury is financial in nature. We therefore conclude that
appellees have standing to sue. Accord HECI Exploration Co. v. Neel, 982 S.W.2d 881,
890 (Tex. 1998) (“A royalty owner may sue for its own damages . . . .”). Coastal’s second
issue is overruled. 
III. Legal Sufficiency of the Evidence 
          Coastal’s third, fourth, and fifth issues challenge the legal sufficiency of the
evidence. When reviewing a legal-sufficiency point, we consider only the evidence and
inferences that tend to support a finding and disregard all evidence and inferences to the
contrary. N. Am. Refractory Co. v. Easter, 988 S.W.2d 904, 908 (Tex. App.—Corpus
Christi 1999, pet. denied). If there is any evidence of probative force to support the finding
(i.e., more than a mere scintilla), we will overrule the issue. Id.
A. Malice
          In its third issue, Coastal argues that the jury’s finding of malice was not supported
by legally sufficient evidence. The definition of malice given to the jury had two alternative
prongs: a specific intent prong and a gross negligence prong. To prove specific intent,
appellees had to show that Coastal specifically intended to cause them “substantial injury
or harm.” See Tex. Civ. Prac. & Rem. Code Ann. § 41.001(7) (Vernon Supp. 2004–05). 
To satisfy the gross negligence prong, appellees had to show that (1) when viewed
objectively, Coastal’s acts or omissions “involved an extreme degree of risk, considering
the probability and magnitude of the potential harm to others,” and (2) Coastal had “actual
subjective awareness of the risk involved but nevertheless proceeded with conscious
indifference to the rights, safety, or welfare of others.” See id. § 41.001(11). 
          Coastal argues that there is no evidence to support a finding of malice under either
the specific intent or gross negligence prong. Coastal’s appellate brief advances two main
arguments: (1) evidence that Coastal’s production department did not check the lease
lines in designing the fracture stimulation does not support the malice finding, and (2)
evidence that Coastal’s land department knew about the fracture stimulation proposal does
not support a finding of malice.
          In response to Coastal’s no-evidence challenge, appellees argue that Coastal’s
failure to check the location of the lease lines is, in fact, evidence of malice. Additionally,
appellees reference ten points of evidence, which, they argue, support the jury’s finding of
malice:
 1.       Coastal conducted an intense fracture stimulation procedure on its
Coastal Fee No. 1 well on Share 12, designed to encroach upon and drain
Share 13.
 
2.       Coastal voluntarily shut in its highly-successful Pennzoil No. 1 well in
order to drill its Coastal Fee No. 1 well.
 
3.       Coastal intended the fracture stimulation procedures to drain oil and
gas from Share 13, and they performed as intended.
 
4.      Coastal possessed an 84% ownership interest on Share 13, but later
acquired a 100% interest on adjoining Share 12. 
 
5.      Despite its implied obligation to develop Share 13 after the completion
of the M. Salinas No. 3, Coastal developed its Share 12 fee property, where
its net revenue interest was 100%.
 
6.       Coastal did not seek GET’s consent before conducting the fracture
stimulation procedures on the Coastal Fee No. 1 well. 
 
7.      In the design of the 1100' fracs implemented in the Coastal Fee No.
1 well, Coastal did not consider lease line boundaries.
 
8.       Because of the instantaneous drainage along the fracture, Professor
Economides [(appellees’ expert witness)] calculated the drainage by trespass
based upon the length of the fracture into Share 13. He estimated the value
of that drainage to be $543,000.
 
9.       Coastal drilled protection wells, albeit ineffective in both time and
location, only after GET filed suit to protect its rights.
 
10.     By the time Coastal drilled the protection wells, after litigation was
commenced, the gas and gas condensate were already gone, having
entered the fracture created in the Coastal Fee No. 1 well. These reserves
could not be produced by a protection well. 
 
In a separate, unnumbered point of evidence, appellees state that “Coastal implemented
the largest ‘frac jobs’ in the field to maximize the possibility that its ‘frac jobs’ would cross
into Share 13 and effect a drainage of the gas and gas condensate found there.” 
          Coastal’s reply brief asserts that appellees’ evidence is “misleading.” Coastal then
proceeds to take issue with some of the evidentiary points enumerated by appellees. 
Coastal maintains that, contrary to appellees’ characterization, “the frac job performed on
the Coastal Fee No. 1 was less effective than most of the frac jobs done on . . . [appellees’]
wells and, in fact, was one of the least effective in the field.” Coastal also disputes
appellees’ assertion that it “intended the fracture and stimulation procedures to drain oil
and gas from Share 13.” According to Coastal, “The gist of this allegation is that if
Coastal’s model predicted that the fracture would travel 1,164 feet, it must have done so.” 
Coastal argues that such reasoning is flawed because the “design model was not intended
to predict exactly what will occur in the field when the fracture treatment is implemented,
but rather was used to compare the effectiveness of frac jobs on various wells.” Coastal
maintains that its model only calculated for the propped length and not the effective length
of the fracture, which is always shorter than the propped length.


 Thus, according to
Coastal, even if the proppant crossed the lease line, it does not necessarily mean that the
fracture would drain oil and gas from the neighboring tract. 
          We conclude that the record contains more than a scintilla of evidence to establish
Coastal’s specific intent to cause substantial injury to appellees. Specific intent means that
“the actor desires to cause the consequences of his act, or that he believes the
consequences are substantially certain to result from it.” Reed Tool Co. v. Copelin, 689
S.W.2d 404, 406 (Tex. 1985) (quoting Restatement (Second) of Torts § 8A (1965)). 
Appellees’ evidence of specific intent is mostly circumstantial, but this is not problematic
because even purely circumstantial evidence can suffice to prove malice. See Mobil Oil
Corp. v. Ellender, 968 S.W.2d 917, 921 (Tex. 1998). In evaluating legal sufficiency, we
determine whether the proffered evidence as a whole rises to a level that would enable
reasonable and fair-minded people to differ in their conclusions. Id. at 922. 
          Dr. Economides testified that the well fraced by Coastal is located 467 feet from
Share 13, such that any fracture treatment of the well exceeding between 467 and 660 feet
in length (depending on the direction of the fracture) would penetrate Share 13. Dr.
Economides also testified that, based on his calculations, as well as the stimulation
proposals relied upon by Coastal, the fracture treatment performed by Coastal was
designed to extend approximately 1,100 feet or more. In Dr. Economides’ opinion, a
“massive” fracture treatment such as the one performed by Coastal in this case would be
the ideal way to “exploit” the reservoir of gas and gas condensate in Shares 12 and 13. 
Based on this evidence, the jury could have reasonably inferred that Coastal intended for
its fracture treatment to penetrate and drain gas and gas condensate from Share 13. 
Furthermore, the jury could have also reasonably inferred that the drainage of gas and gas
condensate from Share 13 would cause substantial injury to appellees in the form of a
financial loss because appellees owned a royalty interest in the gas and gas condensate
produced from Share 13 but had no such interest in Share 12. 
          Because we hold that the jury’s finding of malice is supported by legally-sufficient
evidence of specific intent, we need not address the legal sufficiency of the evidence to
prove that Coastal was grossly negligent, which was the alternative way of establishing
malice. See Tex. R. App. P. 47.1. Coastal’s third issue is overruled. B. Felony Theft
          In its fourth issue, Coastal argues that the punitive damages award must be
drastically reduced because the statutory cap on punitive damages applies in this case. 
See Tex. Civ. Prac. & Rem. Code Ann. § 41.008(b) (Vernon Supp. 2004–05) (statutory cap
on punitive damages). In order to avoid the statutory cap on punitive damages, appellees
alleged that Coastal was guilty of felony theft.


 This allegation required appellees to prove,
beyond a reasonable doubt, that when Coastal fractured its well, it intended to and did
unlawfully deprive appellees of their property in an amount in excess of $20,000. See id.;
Tex. Penal Code Ann. § 31.03(e)(4)–(7) (Vernon Supp. 2004–05) (felony theft). The jury’s
affirmative finding on this point removed the cap that otherwise would have limited any
punitive damage award to $1,087,532, twice the actual economic damages awarded for
trespass. See Tex. Civ. Prac. & Rem. Code Ann. § 41.008(b), (c)(13). 
          On appeal, Coastal argues that the trial court should have applied the cap because
there is no evidence that Coastal’s intent in fracing its well was to deprive appellees
unlawfully of their property. According to Coastal, the evidence overwhelmingly
demonstrated that all area wells must be fraced to be productive and Coastal’s sole intent
was to allow the well to be productive.
          We disagree. We have concluded that there is more than a scintilla of evidence in
the record to prove that Coastal acted with specific intent to cause a substantial injury by
draining gas and gas condensate from Share 13, thereby diminishing appellees’ royalties
and causing them to incur a financial loss exceeding half-a-million dollars. The jury’s
award of damages in the amount of $543,776 establishes that the value of the property
taken from appellees exceeded $20,000. This is more than a scintilla of evidence to prove,
beyond a reasonable doubt, that when Coastal fractured its well, it intended to and did
unlawfully deprive appellees of their property in an amount in excess of $20,000. See Tex.
Penal Code Ann. § 31.03(e)(4)–(7). We therefore overrule Coastal’s fourth issue. 
C. Bad Faith Pooling
          In its fifth issue, Coastal challenges the jury’s finding that it breached its contractual
duty to pool in good faith, for which the jury awarded appellees $1 million (subsequently
reduced to $81,619). The leases executed between Coastal and appellees granted
Coastal the authority to combine or “pool” tracts from two or more leases into a single unit. 
See Southeastern Pipe Line Co. v. Tichacek, 997 S.W.2d 166, 170 (Tex. 1999) (“A lessee
has no power to pool without the lessor’s express authorization, which is usually contained
in the lease’s pooling clause.”). The primary legal consequence of pooling is that
production and operations anywhere on the pooled unit are treated as if they have taken
place on each tract within the unit. Id. If the lessee pools in good faith, the lessee is
relieved of the obligation to reasonably develop each tract separately, or to drill off-set
wells on other tracts included in the unit to prevent drainage by a well on one or more of
such tracts. Id. In other words, there can no longer be drainage of the individual leases
by a unit well, only drainage of the unit by wells located outside the unit. Id. Conversely,
if the unit is not pooled in good faith, production will be considered to take place only on
the actual tract upon which it occurs, and production from a unit well will not maintain
off-site leases. Id. Generally, the question of good faith or bad faith pooling and unitization
is a fact issue to be resolved by the trier of fact. Circle Dot Ranch v. Sidwell Oil & Gas, 891
S.W.2d 342, 347 (Tex. App.—Amarillo 1995, writ denied). 
          Coastal asserts that the jury’s finding of bad faith pooling is supported by no
evidence; however, John Wilson, an expert witness for appellees, testified that Coastal
formed a pooled unit in a manner that financially penalized appellees, even though there
were other ways to pool without creating such a penalty. Wilson also testified that the
penalty incurred by appellees directly benefitted Coastal.
          We agree with the Amarillo court’s conclusion that a lessee should not be required
to subordinate its own interests entirely to the interests of the lessor, Elliott v. Davis, 553
S.W.2d 223, 226 (Tex. App.—Amarillo 1977, writ ref’d n.r.e.), but at the same time, we
believe it is equally important that a lessee be prohibited from subordinating the lessor’s
interests entirely to its own when it comes to the duty of good faith pooling. As the court
stated in Circle Dot Ranch, “the lessee’s primary obligation is to exercise the pooling power
in good faith, taking into account the interests of both lessee and lessor.” Circle Dot
Ranch, 891 S.W.2d at 346 (emphasis added, internal quotations and citations omitted). 
The evidence favoring the jury’s finding of bad faith pooling tends to prove that Coastal did
not adequately consider the financial interests of appellees in exercising its pooling power. 
This is more than a scintilla of evidence of bad faith pooling. Coastal’s fifth issue is
therefore overruled. 
IV. Punitive Damages
          Coastal’s sixth and seventh issues challenge the jury’s award of punitive damages. 
In its sixth issue, Coastal argues that punitive damages were not recoverable in this case
because there was no award of tort damages. In its seventh issue, Coastal argues that the
jury’s award of punitive damages violates its due process rights under the United States
Constitution. 
A. Availability of Punitive Damages
          Punitive damages cannot be recovered without a finding of an independent tort and
an award of actual tort damages. See Fed. Express Corp. v. Dutschmann, 846 S.W.2d
282, 284 (Tex. 1993). According to Coastal, appellees were not entitled to an award of
punitive damages because they failed to submit a question on the damages caused by
Coastal’s alleged trespass. The trial court submitted the following question on damages:
QUESTION NO. 8:
 
What sum of money, if any, if paid now in cash, would fairly and reasonably
compensate Plaintiffs for the damages proximately caused by the
Defendant’s failure to prevent substantial drainage from the Salinas Lease
caused by the trespass?
 
Consider the following elements of damages, if any, and none other: 
The value of the royalty on the gas drained from Share 13 by the subsurface
trespass from the Coastal Fee No. 1 well. 

          Coastal argues that Question 8 did not inquire about damages for Coastal’s alleged
conduct as trespasser, but instead sought contract damages caused by Coastal’s breach
of the contractual covenant to protect against drainage, a covenant that was implied in its
oil and gas lease contract on Share 13. This is confirmed, according to Coastal, by
Question 8’s dependence on Question 7, which asked whether Coastal “failed to act as a
reasonably prudent operator to prevent substantial drainage . . . caused by the subsurface
trespass by fracture treatment . . . .” Coastal argues that the jury’s award of damages in
response to Question 8 was based on in its finding in Question 7 that Coastal breached
the implied covenant to protect against drainage, not its allegedly tortious conduct as an
adjoining landowner. 
          We find it significant that Questions 7 and 8 were each conditioned on a “yes”
answer to Question 6, which asked whether “there has been substantial drainage of gas
and gas condensate . . . caused by the subsurface trespass from the fracture treatment
. . . .” As the jury’s affirmative findings demonstrate, Coastal’s trespass caused substantial
drainage of gas and gas condensate from Share 13. These are the damages that
Question 8 measured and awarded. 
          The tort and contract damages in this case necessarily overlap because Coastal
played two different roles in causing the damages incurred by appellees: As an adjoining
landowner, Coastal trespassed onto Share 13, and as the lessee of Share 13, it failed to
protect against the substantial drainage caused by its trespass. Although Coastal’s two
different roles created two distinct injuries, one sounding in tort and one sounding in
contract, the damages from both injuries are the same: diminished royalties caused by the
drainage of gas and gas condensate from Share 13. Not only are the damages the same,
they are inseparably linked to the two different injuries that caused them. If, on the one
hand, Coastal had not trespassed onto Share 13, there would have been no drainage to
protect against and therefore no contract damages for failure to protect against drainage. 
If, on the other hand, Coastal had protected against the drainage, its trespass would have
been harmless, causing no tort damages for trespass. For this reason, we conclude that
the jury’s answer to Question 8 constituted an award of actual tort damages and overrule
Coastal’s sixth issue. B. Due Process
          The Due Process Clause of the Fourteenth Amendment prohibits a State from
imposing a “grossly excessive” punishment on a tortfeasor. BMW of N. Am. v. Gore, 517
U.S. 559, 562 (1996) (quoting TXO Prod. Corp. v. Alliance Res. Corp., 509 U.S. 443, 454
(1993)). Punitive damages may properly be imposed to further a State’s legitimate
interests in punishing unlawful conduct and deterring its repetition. Id. at 568. States
necessarily have considerable flexibility in determining the level of punitive damages that
they will allow in different classes of cases and in any particular case. Id. Only when an
award can fairly be categorized as “grossly excessive” in relation to these interests does
it enter the zone of arbitrariness that violates the Due Process Clause of the Fourteenth
Amendment. Id.     
          Elementary notions of fairness enshrined in the constitutional jurisprudence of the
United States Supreme Court dictate that a person receive fair notice not only of the
conduct that will subject him to punishment, but also of the severity of the penalty that a
State may impose. Id. at 574. Three guideposts have been used by the high Court: (1)
the degree of reprehensibility of the conduct; (2) the disparity between the harm or
potential harm suffered by the plaintiff and his punitive damages award; and (3) the
difference between this remedy and the civil or criminal penalties authorized or imposed
in comparable cases. Id. at 575. Our de novo application of these three guideposts to the
facts of this case follows. See State Farm Mut. Auto. Ins. Co. v. Campbell, 538 U.S. 408,
418 (2003) (“appellate courts . . . [must] conduct [a] de novo review of . . . the jury’s
award”). 
Degree of Reprehensibility
          Perhaps the most important indicium of the reasonableness of a punitive damages
award is the degree of reprehensibility of the defendant’s conduct. Gore, 517 U.S. at 575. 
Exemplary damages imposed on a defendant should reflect “the enormity of his offense.” 
Id. (quoting Day v. Woodworth, 54 U.S. 363, 13 HOW 363, 371 (1852)). This principle
reflects the accepted view that some wrongs are more blameworthy than others. Id. 
Thus, the Supreme Court has noted that “‘trickery and deceit’ are more reprehensible than
negligence.” See id. at 576 (internal citation omitted). The high Court has also explained
that intentional malice can be the decisive element in a “close and difficult case.” See id. 
          Although Coastal’s conduct did not cause physical injury, it did involve a substantial
amount of economic harm. Coastal breached its contract and committed the intentional
tort of trespass. It acted with malice, and its conduct amounted to felony theft. 
Furthermore, the harm inflicted on appellees was possible only because Coastal abused
its dual roles as lessee and adjacent landowner. Given these considerations, we conclude
that Coastal’s conduct was sufficiently repugnant to justify a punitive damages award
befitting a substantial degree of reprehensibility. 
 
Ratio
          The second and perhaps most commonly cited indicium of an unreasonable or
excessive punitive damages award is its ratio to the actual harm inflicted on the plaintiff. 
Id. at 580. The Supreme Court has consistently rejected the notion that the constitutional
line is marked by a simple mathematical formula, even one that compares actual and
potential damages to the punitive award. See id. at 582. 
          The ratio in this case is approximately 20 to 1. It is markedly lower than both the
500 to 1 ratio rejected in Gore and the 145 to 1 ratio rejected in Campbell. See Campbell,
538 U.S. at 452; Gore, 517 U.S. at 582. Admittedly, it exceeds the “single-digit multipliers,”
which, according to the Supreme Court, “are more likely to comport with due process,” 
Campbell, 538 U.S. at 452; however, the Supreme Court has clarified that such “ratios are
not binding . . . [but] instructive.” Id. Thus, the precise award in any case must be based
upon the facts and circumstances of the defendant’s conduct and the harm to the plaintiff,
not a bright-line rule forbidding ratios exceeding 10 to 1. See id. Although the harm
suffered by appellees may have been compensated by the jury’s award of damages, the
highly unlawful nature of Coastal’s conduct (it being a breach of contract, an intentional
tort, and felony theft) prevents this Court from concluding that the ratio 20 to 1 was grossly
excessive. 
Sanctions for Comparable Misconduct
          Comparing the punitive damages award and the civil or criminal penalties that could
be imposed for comparable misconduct provides a third indicium of excessiveness. Gore,
517 U.S. at 583. This third guidepost proves to be the least helpful in this case because
we have been cited to no cases involving comparable misconduct. Apparently, appellees
are the first plaintiffs in Texas to have successfully asserted a cause of action for
subsurface trespass by hydraulic fracture stimulation treatment of an oil and gas well. We
therefore have no judgments in similar cases to which we can compare the damages
awarded in this case.
          The criminal penalties for felony theft, in contrast, are defined by statute. Theft of
property exceeding $200,000 is a first degree felony. See Tex. Penal Code Ann. §
31.03(e)(7) (Vernon Supp. 2004–05). An individual who commits felony theft is subject to
imprisonment for a term ranging from 5 to 99 years, in addition to a fine not to exceed
$10,000. See Tex. Penal Code Ann. § 12.32 (Vernon 2003). Coastal, being a corporate
entity and not an individual, would be subject to a fine not to exceed twice the amount
gained or caused to be lost or damaged, whichever is greater. See Tex. Penal Code Ann.
§ 12.51 (Vernon 2003). That amount would be $1,086,000. 
          The maximum fine Coastal could be subjected to if prosecuted for felony theft is
much lower than the $10 million award of punitive damages, but this disparity, while
noteworthy, is the product of a comparison of dubious utility. Coastal breached its contract,
trespassed, and committed felony theft, but only one of these illegalities is accounted for
in a comparison between the punishment for felony theft and the punitive damages award
in this case. Without the benefit of more complete information on which to base an
adequate comparison, this Court cannot conclude that the third guidepost militates towards
a finding of gross excessiveness. 
          On balance, the factors by which the United States Supreme Court has instructed
appellate courts to evaluate awards of punitive damages tend to favor a conclusion that
the damages awarded in this case are not grossly excessive and do not violate the
Fourteenth Amendment’s guarantee of substantive due process. Coastal’s seventh issue
is therefore overruled. 
 V. Damages
          Coastal’s eighth and ninth issues challenge the measures of damages submitted
to the jury for appellees’ claims for failure to protect against substantial drainage and failure
to develop the leasehold. 
A. Failure to Protect Against Substantial Drainage
          As mentioned above, supra IV. A., the trial court submitted one question on
damages that encompassed the damages from both the alleged trespass and the alleged
failure to protect against substantial drainage. Coastal argues the jury’s award of damages
for failure to protect against substantial drainage must be reversed and rendered in its
favor because the measure of damages stated in Question 8 was improper for failure to
protect against substantial drainage, though it may have been the proper measure for
trespass. We disagree that a reversal is in order. See Tex. R. App. P. 44.1(a). 
          Although the measure of damages stated in Question 8 might have been improper
for a claim of failure to protect against substantial drainage, Coastal does not challenge the
instruction as a measure of damages for trespass. In deciding Coastal’s sixth issue, we
concluded that Question 8 measured appellees’ trespass damages. Because Coastal has
not challenged Question 8 as a measure of damages for trespass, we cannot conclude
that the error of which Coastal complains probably led to the rendition of an improper
judgment. See id. Coastal’s eighth issue is overruled. 
B. Failure to Develop the Leasehold
          Coastal also complains that the trial court erred by instructing the jury that the
measure of damages for breach of the implied covenant to develop was the “value of the
interest income on the royalty amount lost to Plaintiffs, if any, through the lessee’s failure
to reasonably develop the Salinas Lease.” According to Coastal, this instruction runs
counter to longstanding Texas law, which holds that the measure of damages for failure
to develop is the difference between the royalty that was actually paid and the royalty that
should have been paid had the lessee exercised ordinary care to develop the lease (the
“royalty rule”). See Tex. Pac. Coal & Oil Co. v. Barker, 6 S.W.2d 1031, 1038 (Tex. 1928)
(discussing other cases that “announce the correct doctrine which requires the lessee to
pay the lessor the amount he actually loses by awarding him without deduction the full
value of royalty lost to him through the lessee’s failure to exercise ordinary care to . . .
develop the minerals in the leased premises”). The gist of Coastal’s complaint is that “the
trial court should have instructed the jury to apply the Barker royalty rule and then allowed
Coastal a dollar-for-dollar credit for the royalties it paid . . . .” Coastal maintains that “it
should not be required to pay the royalty again when development took place . . . .”
          The trial court’s measure of damages did not run afoul of supreme court precedent. 
A lessee’s obligations in the performance of the implied covenants as to development,
operation, equipping and marketing are measured by the same rule, reasonable diligence,
or what an ordinarily prudent and diligent operator would do. Rhoads Drilling Co. v. Allred, 
70 S.W.2d 576, 585 (Tex. 1934). Should it be found that the lessees or their assigns failed
to exercise reasonable care in exploring, developing, or producing the oil and gas in the
leased land, the parties or party in default would be liable to the lessors for the damages
thereby sustained. Mon-Tex Corp. v. Poteet, 19 S.W.2d 32, 34 (Tex. 1929).
          The jury found that Coastal failed to act with reasonable diligence—failed to act as
an ordinarily prudent and diligent operator—in its development of Share 13. The evidence
in support of this finding tended to prove that Coastal delayed unreasonably in developing
the tract, a delay which, according to appellees’ expert witness, cost appellees $2,292,513
in lost interest income. A damages award such as the one advocated by Coastal, based
on the difference between royalties actually received and royalties that should have been
produced, would not at all account for the damages sustained by appellees, as the
leasehold was eventually developed after the commencement of this suit. Application of
Coastal’s measure of damages would have contradicted the supreme court’s holding in
Poteet that a party in breach of an implied covenant is “liable to the lessors for the
damages thereby sustained.” See id. As the Barker court stated, “the correct [measure]
. . . requires the lessee to pay the lessor the amount he actually loses . . . .” Barker, 6
S.W.2d at 1038. The amount lost by appellees is the interest income on the delayed
royalties. That is the amount measured by the jury’s instruction. The jury’s award of
damages did not force Coastal to pay royalties twice; it awarded appellees interest on the
royalties appellees would have received if Coastal had not breached the implied covenant
to develop the leasehold. Accord Freeport Sulphur Co. v. Am. Sulphur Royalty Co., 6
S.W.2d 1039, 1045 (Tex. 1928) (allowing the recovery of interest income on royalties that
were delayed). Coastal’s ninth issue is overruled. 
VI. Admissibility of 1977 Memorandum 
          In its tenth issue, Coastal complains that the trial court erred by admitting into
evidence an internal memorandum written by a Coastal employee in 1977. We must
uphold the trial court’s admission of the 1977 memo if there is any legitimate basis for the
ruling, see Torrington Co. v. Stutzman, 46 S.W.3d 829, 845 n.13 (Tex. 2000), because the
admission of evidence is a matter committed to the trial court’s sound discretion. Interstate
Northborough P’ship v. State, 66 S.W.3d 213, 220 (Tex. 2001). We cannot reverse a trial
court’s ruling for an abuse of discretion merely because we may disagree with that
decision. Beaumont Bank, N.A. v. Buller, 806 S.W.2d 223, 226 (Tex. 1991). 
A. Relevancy 
          Coastal argues that the 1977 memo was inadmissable because it was not relevant. 
See Tex. R. Evid. 402. (“Evidence which is not relevant is inadmissible.”). Relevant
evidence is evidence having any tendency to make the existence of any fact that is of
consequence to the determination of the action more probable or less probable than it
would be without the evidence. Stutzman, 46 S.W.3d at 845 n.13 (citing Tex. R. Evid.
401). To be relevant, in other words, the proposed testimony must be sufficiently tied to
the facts of the case that it will aid the jury in resolving a factual dispute. Gammill v. Jack
Williams Chevrolet, 972 S.W.2d 713, 720 (Tex. 1998). Testimony that is inadmissible in
the first instance may become relevant and admissible in rebuttal, but the alleged rebuttal
evidence must be in fact offered to rebut other evidence, not as a part of the proponent’s
case-in-chief. See Waldrep v. Tex. Emplrs. Ins. Assoc., 21 S.W.3d 692, 706 (Tex.
App.—Austin 2000, pet. denied). 
          The 1977 memo was irrelevant, according to Coastal, because it dealt only with title
issues related to Share 13, issues which, according to Coastal, were not litigated in the
instant case. At trial, Coastal raised title issues as a defensive theory to appellees’ failure-to-develop claim, but the title issues involved Share 15, which is located on a tract of land
adjacent to Share 13. As with Share 13, Coastal owns Share 15’s mineral estate but not
its surface rights. The surface rights are held by the Coates family, which also holds a
royalty interest in the mineral estate. 
          Coastal raised the title problems with Share 15 as follows. In the portion of her
opening statement related to appellees’ claim for failure to develop the leasehold, counsel
for Coastal contended that “title disputes [to Share 15] had been going on” and that
Coastal “wasn’t able to simply drill down here [on Share 13] until some things got resolved
. . . . There were [title] problems that Coastal had been trying to resolve for a long time and
all they did was get sucked into lawsuits trying to do it.” To prove this contention at trial,
Coastal presented the testimony of Steve Salge, its director of land for the district of south
Texas. Salge testified that Coastal’s delay in developing Share 13 was caused by
complications related to title issues involving Share 15. Salge testified that Coastal was
“trying to cure up [these] title issues so that we could actually drill some additional wells,
specifically, it would have been those wells located along the – where the 5, 7, and 8 are
and then eventually the 10 and 11 because we had – we had some title concerns up there
that previously had hindered the drilling of those wells.” 
          Even though Coastal raised title issues as a defensive theory to appellees’ failure-to-develop claim, it argues that the 1977 memo was nonetheless irrelevant because it
discussed title problems related to Share 13, not Share 15. These two groups of title
problems, Coastal argues, are completely unrelated. 
          We disagree with Coastal on this point. Although the disputes in question are
undoubtedly distinct, both legally and factually, each is relevant to a central issue of this
case: the reasonableness of Coastal’s failure to develop Share 13 because of title
problems. In the 1977 memo, a Coastal employee recommended that, despite the title
problems with Share 13, Coastal should “assume the calculated risks of drilling . . . [a] well
[on Share 13].” The memo further advised that “if . . . [the well] is a producer we can file
an interpleader suit and let the court decide which parties are entitled to royalties and the
percentages.” Thus, the memo can be fairly characterized as stating that development of
Share 13 would be reasonable despite any title problems.


 We conclude that the 1977
memo was relevant because its recommendation to drill despite title problems could have
helped the jury to decide whether Coastal was reasonable in delaying its development of
Share 13 because of title problems with Share 15. In reaching this conclusion, we
emphasize that we do not review the admission of evidence de novo but are instead
restricted to an abuse-of-discretion standard under which we cannot reverse the trial
court’s ruling simply because we would have reached the opposite conclusion. See Buller,
806 S.W.2d at 226. 
B. Unfair Prejudice
          Coastal further contends that even if the 1977 memo is held to be relevant, the trial
court nonetheless erred by admitting it because it was unfairly prejudicial. See Tex. R.
Evid. 403. In particular, Coastal argues that the following passage from the memo caused
it to be “tried . . . for racism”:
The complex problems encountered by Mr. Slator result from the fact that
possession of these lands began over 200 years ago and the people in
possession were mostly illiterate Mexicans and later Mexican-Americans who
had large families, many estate problems, heirship problems and errors of
all kinds involving surveys and resurveys, partitions and attempted partitions.

Coastal contends that the language about “illiterate Mexicans” was offered specifically for
its potential to create prejudice, confuse the issues, and mislead the jury. 
          All relevant evidence is admissible unless its probative value is substantially
outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the
jury. See Tex. R. Evid. 403; Easter, 988 S.W.2d at 916. Rule 403 thus requires the trial
court to conduct a balancing test to determine whether the proffered evidence is
admissible. TCA Bldg. Co. v. Northwestern Res. Co., 922 S.W.2d 629, 637 (Tex.
App.—Waco 1996, writ denied). Rule 403’s balancing test generally comes into play when
the probative value of the evidence is low or the problems with the evidence are serious. 
Farr v. Wright, 833 S.W.2d 597, 602 (Tex. App.—Corpus Christi 1992, writ denied). 
          We have concluded that the 1977 memo was probative of Coastal’s
unreasonableness in delaying production of Share 13 because of title problems with Share
15. The memo showed that previous title problems had not hindered Coastal’s
development of Share 13, even when the title problems dealt with Share 13, the actual
tract of land which was to be developed. Although the title problems raised as a defense
by Coastal involved a different tract of land, this distinction militates (if at all) against the
reasonableness of Coastal’s delay in developing Share 13. 
          Next, we must balance the probative value of the 1977 memo against the danger
of unfair prejudice, confusion of the issues, or misleading the jury. See Tex. R. Evid. 403;
Easter, 988 S.W.2d at 916. Unfair prejudice is an undue tendency to suggest a decision
on an improper basis, commonly, though not necessarily, an emotional one. Weidner v.
Sanchez, 14 S.W.3d 353, 365 (Tex. App.—Houston [14th Dist.] 2000, no pet.). Coastal
characterizes the 1977 memo as an illicit use of race to gain courtroom advantage. To
prove that the use of race is unfairly prejudicial, Coastal makes the following argument with
which this Court wholeheartedly agrees:
In Texas, you can’t say you should win because your adversaries are “yellow
nigs” or “yellow darkies.” Tex. Employers’ Ins. Ass’n v. Haywood, 266
S.W.2d 856, 858–59 (Tex. 1954). You can’t argue that a witness would lie
for money because he is a Jew. See Tex. Employers’ Ins. Asso. v. Jones,
361 S.W.2d 725, 727 (Tex. Civ. App.—Waco 1962, writ ref’d n.r.e.). You
can’t say that Americans should not lose their case to aliens. See Penate v.
Berry, 348 S.W.2d 167, 168 (Tex. Civ. App.—El Paso 1961, writ ref’d n.r.e.). 
You can’t call your opponent a wetback. See Basanez v. Union Bus Lines,
132 S.W.2d 432, 433 (Tex. Civ. App.—San Antonio 1939, no writ). And you
can’t appeal to jurors for ethnic unity based on a shared Hispanic heritage. 
See Tex. Employers’ Ins. Ass'n v. Guerrero, 800 S.W.2d 859, 862–63 (Tex.
App.—San Antonio 1990, writ denied). 
 
Although we agree that courtroom strategies appealing to racial or ethnic biases are highly
improper and unfairly prejudicial, we cannot conclude that the memo’s language about
“illiterate Mexicans” is anywhere near as inflammatory as the remarks made in the cases
cited by Coastal. The memo simply cannot be considered “an appeal to . . . prejudice in
language clear and strong,” Berry, 348 S.W.2d at 168–69, especially because it was
written by a Coastal employee and did not ask the jury to decide the case on an improper
basis as did the arguments made in the cases cited by Coastal. For this reason, we cannot
conclude that the trial court abused its discretion by admitting the memo over Coastal’s
objection of unfair prejudice. 
          In support of its tenth issue, Coastal raises two collateral arguments, which this
Court is compelled to address. It argues that the memo’s danger of unfair prejudice was
magnified by the testimony of appellee Margarito Salinas that he was “insulted,”
“infuriated,” and “really, really mad” about the “illiterate Mexicans” language because it was
“my ancestors” who were being insulted. Salinas also testified that the rest of his family
members “feel . . . the same way. They feel hurt. They feel infuriated.” 
          The foregoing testimony may have been held inadmissible on several grounds, the
most obvious of which being relevancy, see Tex. R. Evid. 401, 402, but Coastal made no
such objections at trial. Coastal’s motion for new trial likewise failed to raise any objection
to the testimony. Although Coastal’s tenth issue complains only of the admission of the
1977 memo, Coastal buttresses this alleged error with the additional error of allowing
testimony by Salinas that was equally as objectionable by Coastal’s reasoning. Salinas’s
testimony that his ancestors were “insulted” by the memo and that he was “infuriated” by
it appears just as prejudicial as, if not more prejudicial than, the memo’s description of the
original landowners as “illiterate Mexicans,” language which could conceivably be an
accurate, though potentially prejudicial, description. We agree that Salinas’s testimony
magnified whatever prejudicial danger the memo presented, but we conclude that this
heightened threat of unfair prejudice should not be considered in the rule 403 balancing
test because Salinas’s testimony was not objected to at trial. Any error related to Salinas’s
testimony was not preserved for appellate review. See Tex. R. App. P. 33.1(a). 
          Coastal also argues that the danger of the memo having a prejudicial effect was
increased by appellees’ closing argument. Counsel for appellees argued that the memo
“shows [Coastal’s] attitude.” He characterized Coastal as “this $10 billion corporation that
didn’t care enough to bring in the person that actually wrote the memo or received the
memo so they can tell you what they really meant. Why are they referring to . . . illiterate
Mexicans?” 
          As with Salinas’s testimony, Coastal made no objections to counsel’s closing
argument. Coastal has not raised improper jury argument as a separate issue on appeal. 
Instead, it appeals only the admission of the 1977 memo and has attempted to
demonstrate the memo’s prejudicial effect by referencing counsel’s closing argument. 
          Although we firmly believe that appeals to racial or ethnic biases are contemptible
practices and are unfairly prejudicial, we cannot conclude that the closing argument made
by appellees’ counsel crossed into this forbidden realm. Instead, we hold that the closing
argument by appellees’ counsel did not increase the danger of unfair prejudice presented
by the memo. Our review of the trial court’s rule 403 balancing test is therefore not
influenced by the appellees’ closing argument. 
          In the cases cited by Coastal, the improper arguments made by counsel were
unmistakably designed to gain courtroom advantage by capitalizing on racial or ethnic
biases.


 They were not mere references to race or ethnicity; they were suggestions that
the case be decided based on improper considerations.


 In contrast, appellees’ closing
argument did not ask the jury to decide the case based on racial or ethnic biases; it
recapped the evidence and responded to the calls for ethnic unity made by Coastal during
its closing argument. The following excerpts are the most notable portions of Coastal’s
closing argument:
I came up here to talk to you about one thing. I came up here to talk to you
about a departmental memo that referred to the term “illiterate Mexican.” 
You heard Mr. Salinas testify that he was offended by the term illiterate
Mexican. I’m sure some of you may have been offended by the term illiterate
Mexican. I want to tell you that I’m offended by the term illiterate Mexican.
. . We all know that our ancestors, our pioneering ancestors, were people
that were more about the land and not people of the letter. The reason this
came about is because this term was used and this term was offensive, but
way back then our people knew the land. Our people knew things that
pertained to the land. Our people knew cattle. Our people knew the game
and the wildlife. Our people knew farming. Our people knew ranching. 
Nobody cared to read or write. That wasn’t an insult. That’s just the way it
was. We survived. And how did we survive? We survived through knowing
the land, through using the land. That’s how we were able to overcome. . . 
And 200 years ago, ladies and gentleman, I would almost guarantee you that
80 percent of the gringos were illiterate. . . Along with their lawyers, the
Plaintiffs have been enriched in this case. “Nadie esta en la calle.” Nobody
is in the street, not the lawyers, not the Plaintiffs. . . I am proud to be a
Mexican American. I am proud to come from Mexican ancestry. That
ancestry settled this country. That ancestry fought. That ancestry was
courageous. And because of that ancestry, I’m here and a lot of us are here
today. 
 
According to this Court’s tally, counsel for Coastal used the term “our people” no less than
six times and the term “we” (meaning Mexican Americans) at least four times. Counsel
referenced and relied upon his common Hispanic “ancestry” throughout his argument,
going so far as to use a Spanish epithet to describe Anglos (i.e., “gringos”). In sum,
Coastal’s closing argument was ostensibly designed to align the jury to Coastal’s counsel
based on a shared Hispanic heritage. But as Coastal acknowledged in its appellate brief,
“you can’t appeal to jurors for ethnic unity based on a shared Hispanic heritage.” See
Guerrero, 800 S.W.2d at 862–63. 
          According to Coastal, its closing argument was necessary to mitigate the prejudicial
effect of the 1977 memo. We disagree. An objection to Salinas’s testimony would have
markedly offset the prejudicial danger of the memo rather than adding to it, but no such
objection was made. Instead, Coastal attempted to use the jury’s Hispanic heritage to its
advantage by having its Hispanic counsel call for ethnic unity during closing argument. 
          In sum, we find that Coastal brings its tenth issue with unclean hands, for it is guilty
of the very wrong of which it complains. Although we are not influenced by any theories
such as “opening the door” or “estoppel,” we find it noteworthy that appellees’ closing
argument was made in express response to the objectionable portions of Coastal’s closing
argument. Our disposition of this issue, however, hinges not on Coastal’s calls for ethnic
unity but on our inability to conclude, based on the facts of this case, that the trial court’s
admission of the 1977 memo amounted to an abuse of discretion. The trial court balanced
the probative value of the memo against the danger of unfair prejudice and concluded that
the balance favored admission of the memo. We have reached the same conclusion, and
in disposing of this issue, we note that even if we had not reached the same conclusion,
we would not necessarily be able to find an abuse of discretion. Buller, 806 S.W.2d at 226
(stating that appellate court cannot reverse trial court’s ruling for abuse of discretion merely
because it may disagree with that decision). Coastal’s tenth issue is overruled. 
VII. Plea in Abatement 
          In its eleventh issue, Coastal contends that the trial court erred by failing to abate
this suit in favor of an earlier-filed suit. According to Coastal, the claims asserted by
appellees in this case are identical to the claims in two earlier suits filed in Hidalgo County
by essentially the same parties. For this reason, Coastal moved to abate the present suit
in favor of the first-filed of the earlier suits, but the trial court denied Coastal’s plea in
abatement. 
          Abatement of a lawsuit due to the pendency of a prior suit is based on the principles
of comity, convenience, and the necessity for an orderly procedure in the trial of contested
issues. Wyatt v. Shaw Plumbing Co., 760 S.W.2d 245, 248 (Tex. 1988). When an
inherent interrelation of the subject matter exists in two pending lawsuits, a plea in
abatement in the second action must be granted. Id. at 247. It is not required that the
exact issues and all the parties be included in the first action before the second is filed,
provided that the claim in the first suit may be amended to bring in all necessary and
proper parties and issues. Id. In determining whether an inherent interrelationship exists,
courts should be guided by the rule governing persons to be joined if feasible and the
compulsory counterclaim rule. Id. (citing Tex. R. Civ. P. 39 (joinder of parties), 97(a)
(compulsory counterclaims)).
          This lawsuit was filed in 1997 in the 206th District Court of Hidalgo County by Garza
Energy Trust and members of the Garza and Salinas families, two branches of the same
family tree. Previously, in 1988, the Garza Energy Trust and members of the Garza family
had filed claims in the 370th District Court of Hidalgo County (“Garza I”) against Coastal
and over twenty other defendants,


 and in 1995, the Salinas plaintiffs filed claims in the
93rd District Court of Hidalgo County (“Salinas”) against Coastal and over thirty other
defendants.



          The three lawsuits are similar in some respects, though the earlier-filed suits clearly
involved more defendants than the latter suit. Each lawsuit involves (1) Share 13, (2)
mineral leases of Share 13 executed between appellees and Coastal, (3) claims for breach
of the implied covenants to protect against drainage and to develop the leasehold, and (4)
drainage of gas and gas condensate from Share 13 because of fracture treatments on
wells located on adjoining tracts of land. Garza I differs from the other two suits because
it involves a title dispute over Share 15. 
          Coastal contends that this lawsuit (“Garza II”) should have been abated in favor of
Garza I because it involves the same parties and the same controversy. According to
Coastal, appellees filed Garza II in the 206th District Court so they could have a friendlier
forum than the 370th District Court. On December 9, 1996, the 370th District Court signed
a summary judgment against the Garza I plaintiffs on their title claims to Share 15. The
trial court then severed the title claims, rendering the summary judgment order final and
appealable, and ordered the remaining claims abated until “after all appeals” of the
summary judgment.


 
          Coastal alleges that the trial court erred by denying abatement of Garza II because
appellees have “conceded that . . . [the] requirements [for abatement] have been or could
be satisfied.” This statement is unsupported by the record. In fact, the opposite is true: 
Appellees have consistently argued that abatement of Garza II was unnecessary and
improper because the claims at issue in Garza I are different from the claims asserted in
Garza II. We agree with appellees on this point.
          The Garza I suit complained about drainage caused by Coastal’s fracture treatment
on a well located on Share 15. In contrast, the Garza II suit complained about drainage
caused by Coastal’s fracture treatment on a well located on Share 12. Not only do the two
cases involve entirely different incidents of drainage, different tracts of land, different wells,
and different damages, the drainage in each suit took place at very different times. The
Garza I drainage allegedly began prior to 1988, whereas the Garza II drainage did not
begin until 1996, when Coastal fraced the Coastal Fee No. 1 well located on Share 12.
          This leaves the failure-to-develop claims. Each of these claims involved Share 13,
and their allegations appear to be very similar: Coastal unreasonably delayed its
development of the leasehold. Although the claims are hardly distinguishable, we note that
Garza II resolved the failure-to-develop controversy only from 1993 to present. The Garza
II jury was asked whether “Defendants failed to reasonably develop the Salinas Lease after
production was obtained after 1993.” In contrast, Garza I sought damages for Coastal’s
failure to develop beginning in 1980. Thus, Garza II did not resolve the failure-to-develop
issue raised by Garza I but actually resolved the issue as it unfolded years after Garza I
was filed. 
          Because we conclude that the Garza I and Garza II claims are different, we next
consider whether there is a inherent interrelation of the subject matter of the suits by
reference to the compulsory counterclaim rule. See id. at 247. Texas Rule of Civil
Procedure 97(a) dictates that a pleading shall assert a counterclaim if it meets six
elements: (1) it is within the jurisdiction of the court; (2) it is not at the time of filing the
answer the subject of a pending action; (3) the action is mature and owned by the pleader
at the time of filing the answer; (4) it arises out of the transaction or occurrence that is the
subject matter of the opposing party’s claim; (5) it is against an opposing party in the same
capacity; and (6) it does not require for its adjudication the presence of third parties over
whom the court cannot acquire jurisdiction. Tex. R. Civ. P. 97(a). The Garza II claims do
not meet the third prong of the compulsory counterclaim rule: they were not mature at the
time of filing the answer because the drainage had not yet occurred and the damages
sought for failure to develop (from 1993 forward) had not yet been incurred. See
Ingersoll-Rand Co. v. Valero Energy Corp., 997 S.W.2d 203, 207 (Tex. 1999) (“A claim is
mature when it has accrued.”). Accordingly, we conclude that there is no inherent
interrelation of the subject matter of the suits. 
          The duty to abate a lawsuit in favor of a pending prior proceeding arises as a
consequence of the dominant jurisdiction rule, under which the court of earliest filing
ascends to a position of dominance over all other courts of later filing. See Miles v. Ford
Motor Co., 914 S.W.2d 135, 138 (Tex. 1995). There are three exceptions to the rule: (1)
where a party has engaged in inequitable conduct that estops him or her from asserting
prior active jurisdiction; (2) where there is a lack of persons to be joined if feasible, or the
power to bring them before the court; and (3) where there is a lack of intent to prosecute
the first proceeding. Id. Although we conclude that there is no inherent interrelation of the
subject matter of the suits and, therefore, no duty to abate Garza II in favor of Garza I, we
think the prolonged abatement of Garza I evidences a lack of intent to prosecute. This is
especially true because Garza I was abated, on motion of the Garza I plaintiffs, until “after
all appeals.” “All appeals” ended on November 12, 1999, when the supreme court denied
a motion for rehearing on a petition for discretionary review of this Court’s judgment
affirming the trial court’s summary judgment against the Garza I plaintiffs. 
          The trial court did not err in denying Coastal’s plea in abatement. We overrule
Coastal’s eleventh issue. 
VIII. Repudiation Instruction 
          In its twelfth issue, Coastal asserts that the trial court improperly refused to submit
a jury instruction on its repudiation defense. Coastal argues that it presented evidence that
appellees repudiated the leases on Share 13 from 1995 to 1997 by seeking a declaration
in Garza I that the leases had terminated. See NRG Exploration v. Rauch, 671 S.W.2d
649, 652 (Tex. App.—Austin 1984, writ ref’d n.r.e.) (“A suit brought by a lessor to have the
lease terminated constitutes a repudiation.”). According to Coastal, appellees’ repudiation
of the leases excused it from its contractual obligations to develop the leasehold, an issue
which should have been submitted to the jury. See King Ranch, Inc. v. Chapman, 118
S.W.3d 742, 756 (Tex. 2003) (“repudiation is often a fact question”). As the supreme court
stated in Ridge Oil:
The law is well-settled in Texas that “lessors who . . . wrongfully repudiate
the lessees’ title by unqualified notice that the leases are forfeited or have
terminated cannot complain if the latter suspend operations under the
contract pending a determination of the controversy and will not be allowed
to profit by their own wrong.” A lessor’s repudiation of a lease relieves the
lessee “from any obligation to conduct any operations, drilling, re-working, or
otherwise, on said land in order to maintain the lease in force pending the
judicial determination of the controversy . . . over the validity of the lease.” 

Ridge Oil Co. v. Guinn Invs., Inc., 148 S.W.3d 143, 157 (Tex. 2004) (footnotes omitted).
          Appellees argue that repudiation is a variation of promissory estoppel, a theory
which requires a showing of detrimental reliance. See Atl. Richfield Co. v. Hilton, 437
S.W.2d 347, 353–55 (Tex. Civ. App.—Tyler 1969, writ denied n.r.e.). According to
appellees, Coastal produced no evidence to show that it relied on the allegations of Garza
I to the effect that the leases had terminated, and thus, a jury instruction on repudiation
was not required as a matter of law. See Tex. R. Civ. P. 278 (stating that courts shall
submit questions raised by written pleadings and evidence). In response, Coastal argues
that there is no requirement of detrimental reliance for a defense based on repudiation. 
          We do not necessarily agree that detrimental reliance must be shown to prove the
defense of repudiation, but the supreme court’s statement in Ridge Oil specifies that any
suspension in development of the leasehold must be related to the “judicial determination
of the controversy.” See Ridge Oil, 148 S.W.3d at 157. Coastal produced no evidence at
trial to prove that its development of Share 13 was delayed by the “judicial determination
of the controversy.” In fact, the evidence shows the opposite: Coastal continued to
develop Share 13 after Garza I was filed and increased development substantially after
Garza II was filed. Because Coastal failed to produce any evidence showing that its delay
in developing Share 13 was related to appellees’ alleged repudiation, the trial court did not
err by refusing to instruct the jury on repudiation. See Tex. R. Civ. P. 278. Coastal’s
twelfth issue is overruled. 
IX. Attorneys’ Fees 
          Coastal’s thirteenth issue argues that appellees’ award of attorneys’ fees must be
reversed and remanded based on their expert’s admission that he could have, but failed
to, segregate attorneys’ fees between recoverable and unrecoverable claims. 
          As Coastal points out, appellees cannot recover attorneys’ fees for either their
trespass claim or their claim for breach of the implied covenant to market, for which the jury
awarded no damages. See Green Int'l v. Solis, 951 S.W.2d 384, 390 (Tex. 1997) (holding
that breach-of-contract claimant was not entitled to attorney’s fees because jury awarded
zero damages); Z.A.O., Inc. v. Yarbrough Drive Ctr. Joint Venture, 50 S.W.3d 531, 550
(Tex. App.—El Paso 2001, no pet.) (“attorney’s fees are not recoverable in tort actions”). 
To ensure Coastal was not charged for attorneys’ fees which are unrecoverable, appellees
were required to segregate their attorneys’ fees between claims on which fees could be
recovered and those on which fees could not be recovered. See Stewart Title Guar. Co.
v. Sterling, 822 S.W.2d 1, 10 (Tex. 1991) (“In order to show the reasonableness and
necessity of attorney’s fees, the plaintiff is required to show that the fees were incurred
while suing the defendant sought to be charged with the fees on a claim which allows
recovery of such fees.”). A recognized exception to this duty to segregate arises when the
attorneys’ fees are incurred in connection with claims arising out of the same transaction
and are so interrelated that their “prosecution or defense entails proof or denial of
essentially the same facts.” Id. at 11. Therefore, when the causes of action involved in
the suit are dependent upon the same set of facts or circumstances and thus are
“intertwined to the point of being inseparable,” the party suing for attorneys’ fees may
recover the entire amount covering all claims. Id.
          Attorney Michael Jones, appellees’ expert on attorneys’ fees, testified at trial that
it was “not impossible” to segregate attorneys’ fees in this case:
Q. [By Coastal’s counsel] Mr. Jones, is it your testimony that it is impossible
for you to segregate the amount of attorney’s fees that you have spent or
incurred in prosecuting the claims for bad faith pooling?
 
A. No, I could probably – I could probably get to those. I was thinking more
about the subsurface trespass and implied covenant to protect. Those are
kind of inextricable. But perhaps the bad faith pooling.
 
Q. And is it your testimony that you’re unable to segregate the amount of
attorney’s fees that you have incurred in prosecuting the claims for
subsurface trespass from the other claims in this lawsuit?
 
A. Very few things are impossible – and I’m not saying that’s impossible, but
the amount of time and the effort would be – and a lot of judgment calls and
some people would say, yeah, that should be excluded and others would
say, no, it shouldn’t so –
 
Q. So it is not impossible, it is just a time-consuming process?
 
A. Yes, sir. 

          After reviewing the record, we conclude that attorneys’ fees incurred on appellees’
claim for breach of the implied covenant to market should have been segregated from the
fees incurred on the other claims for which attorneys’ fees were recoverable. We further
conclude that appellees’ trespass claim and claim for breach of the implied covenant to
protect against drainage are inseparably intertwined because they involved proof of
essentially the same facts (i.e., Coastal’s drainage of Share 13 gas and gas condensate
by hydraulic fracture stimulation treatment of a well located on Share 12). Accordingly, the
attorneys’ fees incurred on appellees’ trespass claim were not subject to the segregation
rule. See id. 
          We sustain Coastal’s twelfth issue in part and remand the cause to the trial court
for a proper determination of attorneys’ fees. See Stewart Title, 822 S.W.2d at 11. The
trial court is instructed to segregate attorneys’ fees incurred on appellees’ claim for breach
of the implied covenant to market from the attorneys’ fees incurred on appellees’ other
claims. 
X. Prejudgment Interest 
          In its fourteenth issue, Coastal argues that this Court should modify the judgment
to reflect the accurate interest rate under House Bill 4, which reduced the post-judgment
interest rate from ten percent per year to the prime rate or, if the prime rate is lower than
five percent, to five percent per year. See Act of June 2, 2003, 78th Leg., R.S., H.B. 4, §
6.01. According to House Bill 4, the change applies to all judgments that are “subject to
appeal on or after the date of this Act.” Act of June 2, 2003, 78th Leg., R.S., H.B. 4, §
6.04. Coastal argues that the judgment in this case was “subject to appeal” on September
1, 2003, and thus, the judgment is inaccurate as to the post-judgment rate. 
          The final judgment in this case was signed on December 17, 2001. As this Court
has explained previously, the language “subject to appeal” used by House Bill 4 means
that the judgment “fully and finally disposes of all parties and all issues before the trial court
and therefore is capable of being appealed.” In re Kajima Int’l, Inc., 139 S.W.3d 107, 117
(Tex. App.—Corpus Christi 2004, orig. proceeding). The judgment in this case was neither
“signed” nor “subject to appeal” on or after the effective date of House Bill 4. In fact, the
appeal was pending in this Court on the effective date of House Bill 4. Consequently, the
post-judgment interest rate prescribed by House Bill 4 is inapplicable. Coastal’s fourteenth
issue is overruled. 
XI. Conclusion 
          We reverse the trial court’s judgment regarding attorneys’ fees and remand that
issue to the trial court for further proceedings consistent with this opinion. In all other
respects, the judgment is affirmed.                                                                                                                                                                                                        _______________________ 
                                                                               DORI CONTRERAS GARZA,
                                                                               Justice
                      Opinion delivered and filed 
this the 7th day of April, 2005.